RUTH CAMERON, Personal Representative of the Estate of HARRY CAMERON, Deceased, and LOIS E. JENKINS, Plaintiffs and Respondents, v. DALE A. CAMERON and JANET M. CAMERON, Defendants and Appellants.

No. 14046.
Submitted Aug. 24, 1978.
Decided Nov. 27, 1978.
587 P.2d 939.

220

Harris, Jackson & Murdo, Helena, Moses, Tolliver & Wright, Billings, for defendants and appellants.

Hooks & Budewitz, Townsend, for plaintiffs and respondents.

MR. JUSTICE SHEEHY delivered the opinion of the Court.

This is an appeal by Dale A Cameron and Janet M. Cameron, appellants, from a judgment in favor of Ruth Cameron and Lois E. Jenkins, respondents, made and entered by the District Court of the Fourteenth Judicial District, Meagher County, sitting without a jury.

In that action respondents sought to invalidate on the ground of undue influence, certain deeds, bills of sale and transfers of motor vehicle titles executed and delivered by Lewis Cameron to Dale Cameron, Janet Cameron and Donald Cameron (Dale and Janet's son) on March 15, 1968. The judgment made by the District Court set aside all instruments of conveyance executed on that date by Lewis Cameron and transferred real and personal property in those conveyances to the personal representative of the estate of Lewis Cameron. Appellants' post-trial motions were denied, except for their motion to stay the execution of the judgment pending the outcome of this appeal.

Lewis Cameron was born in Scotland in 1882 and came to the United States as a small child. He spent most of his life ranching near Martinsdale, Montana. Lewis married Mollie McCrea in 1911 and three children were born to this marriage: Harry M. Cameron in 1912 ("Harry"), Dale A. Cameron in 1915 ("Dale"), and Lois E. Jenkins in 1917 ("Lois"). Harry, the oldest of the Cameron children, lived at the ranch near Martinsdale and worked for the U.S. Forest Service until 1941 when he returned to ranching fulltime with his father and brother, Dale, in the family ranching operation.

In 1945 or 1946, Harry purchased what is known as the "River Ranch", consisting of 480 acres located some 12 miles south of the

Lewis Cameron ranch and moved his family there. Harry then began ranching operations on his own, although Lewis, Dale and himself apparently continued occasionally to trade work on their respective ranches.

Dale lived at the ranch near Martinsdale and worked with his father and brother in the ranching operation. Since 1941, Lewis and Dale operated the home ranch together on the Lewis Cameron land and on about 1,800 acres of land which Dale had purchased. Dale's land is located adjacent to and integrates with Lewis' land so that the two ranches were operated basically as a single unit. However, the operation was not a formal partnership and each paid his own debts, each bought machinery individually though they did not duplicate equipment, and each ran his own cattle with his separate brand. They divided the proceeds from the sale of cattle, which was their only cash crop. Dale and his wife, Janet, resided upon the Lewis Cameron property in the family ranch house and later in a mobile or trailer home.

Mollie preceded Lewis in death in 1961. Harry died intestate on April 16, 1976, but Dale and Lois are still living. Harry's wife, Ruth as personal representative of his estate, was substituted as a plaintiff in this action.

During the years they ranched, Lewis and his wife acquired real property consisting of 2,053 deeded acres, a Forest Service grazing permit, a residence and other buildings, vehicles and equipment customarily found in a ranching operation in Montana.

Lois has not lived on the ranch since 1935 when she left to attend business college. She returned for brief periods during World War II and then married and moved to Helena. She and her husband visited the ranch continually since that time and Lois was well liked by Lewis.

Lewis' deceased wife had by her Will and an accompanying letter, passed her estate to Lewis and she had directed he divide their property upon his death between the children. Lewis did not make, or execute a Will with such provisions prior to his death in 1968.

He had often expressed a desire for the children to get together to decide how the property was to be distributed.

Approximately 1½ to 2 years before his death, Lewis was brought by his son, Harry, to the office of John Potter, an attorney of White Sulphur Springs, Montana, to discuss making a Will. Lewis indicated he wanted to treat all the children fairly and that as a possibility, Dale could keep the ranch, with a "fair share" for Harry and Lois. However, no Will was drafted at that time because Lewis was uncertain about what to give Lois without breaking up the ranch operation.

In February 1968, Harry requested the same attorney draft a proposed Will for purposes of discussion with Lewis. Harry also requested the attorney draft a deed conveying to Harry a parcel of land owned by Lewis giving acess to the Forest Service grazing permit. Neither of these documents, though drafted, were ever executed.

Lewis has hospitalized for a two-week period beginning approximately February 10, 1968, for jaundice, constipation, senile arteriosclerosis, bilateral inguinal hernias and pulmonary asthma emphysema. Lewis was 85 years old at this time. While in the hospital, Lewis had difficulty remembering the location of his room and appeared generally confused, according to witness' testimony. However, Lewis' doctor in his deposition indicated he observed no mental condition that would have impaired Lewis' ability to know what property he owned and who were the members of his family.

After his discharge from the hospital, Lewis was taken to his home by Harry and his wife, Ruth. Following an accident involving a propane gas appliance at his house in early March, Lewis went to live with Dale and Janet. He stayed there until after the events of March 15, 1968, when he returned to his own house. Shortly thereafter he was hospitalized in Helena and remained there until his death on April 16, 1968.

The state of Lewis' health for the period from the first of Febru-

ary until his death was debated at trial. Testimony was given at trial that Lewis' eyesight and hearing were failing badly, that he was at times disoriented, not recognizing where he was or who family members were. It was also testified that he had on occasion hallucinated. However, other evidence was presented that on March 18, 1968, on a visit to his doctor in Harlowton, Lewis was able to purchase a pair of slippers on his own and converse cogently with the proprietor, a long-time friend.

As previously mentioned, for a number of years prior to March 15, 1968, Lewis had expressed a desire that the members of his family get together to divide up the property. Pursuant to this wish, a meeting was arranged on or about March 2, 1968, between Harry, Dale and Lois. However, Harry did not come and therefore nothing was resolved at that time.

Harry and Dale had often discussed the division of the property but they could not come to terms as to who would get land and who would get money.

On March 14, 1968, while returning together from a lodge meeting in Harlowton, Harry indicated to Dale that the ranch was Lewis' and that Lewis could do whatever he wished with it. Harry had apparently expressed this thought to others prior to this time. On March 15, 1968, Ralph LaRue, an officer of the First National Bank and Trust Company of Helena, arrived at Dale's residence along with one E. P. Fogland. Dale had written to the bank requesting to change signature cards in Lewis' checking account so that Dale could sign checks for Lewis to pay his bills. LaRue had brought those cards with him while he was in the area on bank business. Lewis had become unable to write because of a mild stroke suffered previously and he wished Dale and Harry to be able to sign his checks. Harold Haugan was at the ranch at Dale's request to notarize the transfer of vehicle titles from Lewis to Dale. Lewis had a conversation with Haugan concerning the disposition of the family property. Haugan suggested a sale but Lewis indicated he did not want Dale to have to pay money for the ranch. Haugan testified that prior to the arrival of LaRue and Fogland, no vehicle

titles were transferred because Lewis did not know exactly what he wanted to do and again expressed a desire that his family get together to divide the property.

When LaRue arrived, Lewis sought his advice concerning the disposition of the property. LaRue indicated Lewis should take the matter up with an attorney but Lewis responded he did not care for attorneys. LaRue and Lewis then went into a room serving as the ranch office to discuss the matter further.

The remaining persons present, Dale, Janet, Donald, Haugan and Fogland were either gathered around the dining room table or in other rooms of the house.

Dale was called into the room with Lewis and LaRue on two occasions. The first was to tell LaRue how many acres of land Lewis owned, though Lewis was present. The second was to inform LaRue as to how many cattle Lewis owned. On one of these occasions Lewis questioned Dale whether any settlement reached would be satisfactory with Harry and Lois. Dale indicated it would, though no attempt was made then to reach Harry or Lois, nor had either been informed of the meetng previously.

According to LaRue's testimony, Lewis and LaRue reached a decision that Dale was to get the land and machinery on the ranch, Harry was to get a money settlement from Dale, and Lois was to get only the household goods and Mollie's personal things. Lewis and LaRue then began to calculate the amount of money Dale should have to pay. LaRue suggested $35 an acre for 1,000 acres. Lewis asked what total amount this would be and LaRue indicated $35,000. Lewis apparently stated this would be too much for Dale to pay. Further calculations were made, LaRue each time doing the arithmetic at Lewis' request. Finally a figure of $15 an acre or $15,000 was settled on by Lewis with interest at 5 percent per year.

LaRue and Lewis then returned to the dining room table and explained the disposition to the group there. Dale produced some blank deed forms and bills of sale he had acquired from the county attorney and asked his wife to type up the deed conveying Lewis's property to Dale and Janet. A bill of sale was prepared conveying

the machinery to Dale and a bill of sale was also prepared conveying Lewis's cattle to Dale's son, Donald. This latter instrument was pursuant to an expressed wish of Lewis that he help Don get started and they would be partners in the herd until Lewis' death. A promissory note from Dale to Harry was drafted by Haugan in the amount of $15,000 plus 5% interest. All these documents were read to Lewis who then made his mark on each (except the note) though LaRue had to hold Lewis' writing arm while he made the mark. The instruments were then witnessed by LaRue and Fogland and notarized by Haugan. Lewis then indicated the documents should be recorded. The signature cards, which were signed prior to the conveyance of the ranch property, created a joint bank account between Dale and Lewis, though the intent had been only to make Dale a signator in Lewis' account. The titles to the motor vehicles not conveyed by the bill of sale were also transferred at this meeting.

The net result of these conveyances and transfers was to divest Lewis Cameron of all his property other than his clothes and an interest in some insurance policies.

After March 15, 1968, Dale and Janet owned the bulk of Lewis' estate. Subsequent to the recording of the deeds, on or about March 24, 1968, Harry and Lois met with their father. Lewis allegedly told them he had met with some bankers and he felt they had "pulled something". Dale came to Lewis' house and Harry began discussing the division of the property. Dale then informed Harry and Lois that the land had been deeded to him. Lewis allegedly indicated that he had not wanted to do that, and that an attorney should be consulted to remedy the situation. Testimony indicated that Lewis was very upset at this disposition of his property and that he demanded of Dale that it be reconveyed to Lewis.

The following week Lewis entered St. Peter's Hospital in Helena. Shortly after his admittance he lapsed into a coma and died.

At all times prior to March 15, 1968, Lewis was on friendly terms with Harry, Dale, Lois and their spouses. Harry's wife, Ruth, and her daughter in law often prepared meals for Lewis and when

he was deteriorating in health would spend the night at his house. Dale and Janet also provided comfort and assistance in addition to maintaining the ranch.

Basically, three issues are presented for review. First, was there sufficient substantial, credible evidence to support the District Court's conclusion that Lewis Cameron was under the undue influence of Dale and Janet Cameron on March 15, 1968 when he executed the conveyances at issue in this case? Second, did the District Court properly deny the appellants' post-trial motions for new trial and to alter and amend the findings and conclusions of the Court? Third, was the District Court without jurisdiction to invalidate the conveyance from Lewis Cameron to Donald A Cameron? For the reasons discussed below, we affirm the District Court as to the first two issues and conclude these appellants are not in a position to raise the third on appeal.

The scope of this Court's review when considering the findings and conclusions of a trial court sitting without a jury is clear and well settled in Montana. A brief consideration of those rules is appropriate at this point.

"This Court's function in reviewing findings of fact in a civil action tried by the district court without a jury is not to substitute its judgment in place of the trier of facts but rather it is 'confined to determining whether there is substantial credible evidence to support' the findings of fact and conclusions of law. *Hornung v. Estate of Lagerquist*, 155 Mont. 412, 420, 473 P,2d 541, 546." *Olson v. Westfork Properties, Inc.* (1976), 171 Mont. 154, 557 P.2d 821, 823.

Although conflicts may exist in the evidence presented, it is the duty of the trial judge to resolve such conflicts. His findings will not be disturbed on appeal where they are based on substantial though conflicting evidence, unless there is a clear preponderance of evidence against such findings. *Westfork Properties, Inc.*, supra; *Butte Teachers' Union v. Board of Education of School District No. 1, Silver Bow County* (1977), 173 Mont. 215, 567 P.2d 51, 53; Rule 52(a), M.R.Civ.P.

■ In determining whether the trial court's findings are supported by substantial evidence, this Court must view the evidence, in the light most favorable to the prevailing party. *Hellickson v. Barrett Mobile Home Transport, Inc.* (1973), 161 Mont. 455, 507 P.2d 523, 525; *Westfork Properties, Inc.*, supra. "Substantial evidence" is evidence such "as will convince reasonable men and on which such men may not reasonably differ as to whether it establishes the [prevailing party's] case, and, if all reasonable men must conclude that the evidence does not establish such case, then it is not substantial evidence." *Morton v. Mooney* (1934), 97 Mont. 1, 33 P.2d 262, 265; *Staggers v. USF&G* (1972), 159 Mont. 254, 496 P.2d 1161, 1163. The evidence may be inherently weak and still be deemed "substantial" and substantial evidence may conflict with other evidence presented. *Campeau v. Lewis* (1965), 144 Mont. 543, 398 P.2d 960, 962.

■ Much of the evidence presented at trial, which the trial judge considered in making his findings and conclusions, consisted of witness' testimony. The credibility of such witnesses is of prime importance is this appeal. "The credibility and weight given the witnesses, however, is not for this Court to determine. This is a primary function of a trial judge sitting without a jury; it is of special consequence where the evidence is conflicting. (Citations omitted.)" *Hellickson,* supra.

It is obvious that the first two issues presented for review can be resolved by a consideration of the sufficiency of the evidence supporting the District Court's findings and conclusions. In considering such evidence we bear in mind the rules recited above. We will not substitute our judgment for that of the trier of fact, but rather will only consider whether substantial credible evidence supports the findings and conclusions. Those findings will not be overturned by this Court unless there is a clear preponderance of evidence against them. We will view the evidence in a light most favorable to the prevailing party, recognizing that substantial evidence may be weak or conflicting with other evidence, yet still support the findings. Finally, where the credibility of witnesses is of prime im-

portance, as it is here, the determination of the weight given to the testimony is the primary function of the trial judge sitting without a jury and not that of this Court.

Turning then, to the question of the sufficiency of the evidence, we find the findings and conclusions were supported by substantial credible evidence and the District Court was correct in denying appellants' post-trial motions.

In Montana, whether undue influence was exercised on a donor making a gift is determined by the same criteria used in deciding whether undue influence was exercised on a testator making a Will. *Patterson v. Halterman* (1973), 161 Mont. 278, 505 P.2d 905, 909. Those criteria were set out in *Estate of Maricich* (1965), 145 Mont. 146, 400 P.2d 873, 881, and most recently affirmed in *Blackmer v. Blackmer* (1974), 165 Mont. 69, 525 P.2d 559, 562. In determining the issue of undue influence, a court may consider:

"(1) Confidential relationship of the person attempting to influence the testator;

"(2) The physical condition of the testator as it affects his ability to withstand the influence;

"(3) The mental condition of the testator as it affects his ability to withstand the influence;

"(4) The unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence, and

"(5) The demands and importunities as they may affect particular [donor] taking into consideration the time, the place, and all the surrounding circumstances." *Blackmer*, 525 P.2d at 562.

The District Court properly applied this test to the evidence presented at trial and found each of the five points to have been satisfied. The District Court concluded that there was a close confidential relationship between Dale and Janet Cameron and Lewis Cameron on the date in question. The evidence presented at trial, in the opinion of the District Court, showed Lewis' mental and physical

health on that date, only 31 days before his death, to be precarious. The court found that even disregarding possibly biased testimony by plaintiffs, there still existed convincing independent testimony that Lewis did from time to time hallucinate. The court found the disposition of the property significantly unnatural. The testimony offered indicated that up to and including March 15, 1978, Lewis wanted to divide his property equitably, with Dale to get a bit more than the others. The result of the disposition of March 15, however, was to give Dale and Janet *most of* Lewis' estate, leaving Harry with only a debt owed him by Dale and leaving Lois only personal belongings of Lewis and Mollie worth less than $500. The District Court found the fifth point satisfied by Dale's statement to Lewis that whatever occurred would be satisfactory to Harry and Lois on that date and the fact that Harry and Lois previously were not informed of the meeting.

Admittedly there was conflicting evidence as to each of these points. However, it is the duty of the trial judge to resolve such conflicts and his findings will not be overturned where they are based, as they are here on substantial though conflicting evidence. *Westfork Properties, Inc.*, supra.

This Court has previously recognized it is not sufficient to prove undue influence that the testator (or donor as here) may have been influenced by the beneficiary-donee as a result of their confidential relationship in the ordinary affairs of life or that he lived with the beneficiary-donee at the time of the gift. *Hale v. Smith* (1925), 73 Mont. 481, 237 P.214, 216.

"Mere general influence in the affairs of life or method of living at the time of the execution of a will by a testator [or conveyance by a donor] is not proof of undue influence . . . in order to establish it as a fact, *it must be shown by proof that it was executed upon the mind of the testator directly to procure the execution of the will.*" *Blackmer*, 525 P.2d at 563 (quoting from Hale v. Smith). (Emphasis added.)

As this Court indicated in *Blackmer*, it must be shown that appellants exercised *undue* influence on the donor, Lewis Cameron. The

act of undue influence must produce a "disposition of property which the [donor] would not have made if freely left to act in accordance with his own pleasure." *Hale v. Smith*, 237 P. at 216. The District Court obviously considered the statement of Dale to Lewis that whatever was done would be satisfactory to Harry, to be such an act resulting in a disposition contrary to Lewis' previous and frequently expressed desires. This statement constitutes an "act of influence", which this Court has found to be necessary before undue influence is established. *Blackmer*, supra.

Appellants argue that this Court should consider the evidence as presented in the record and find the conveyances valid. To do that would be to substitute the judgment of this Court for that of the trier of fact and as we have stated, that is not the function of this Court in reviewing a decision of a District Court. Rule 52(a), M.R. Civ.P. Appellants have not shown by a clear preponderance of the evidence that the findings of the District Court are incorrect and it is their burden to do so. *Hellickson v. Barrett Mobile Home Transport, Inc.*, supra.

The final issue presented for appeal is whether the District Court had jurisdiction to set aside the conveyance from Lewis to Donald Cameron. Without deciding the substantive question concerning the jurisdiction of the District Court, we conclude appellants Dale and Janet Cameron are not parties aggrieved as to that portion of the judgment setting aside the conveyance from Lewis to Donald. These appellants therefore cannot raise that issue on appeal.

"It is a general rule, of universal application, that to enable a party to appeal from a judgment or order he must have an interest in the subject-matter of the litigation which is injuriously affected by the judgment or order." *Griffith v. Montana Wheat Grower's Association* (1926), 75 Mont. 466, 244, P. 277, 278; In Re Stoian Estate (1960), 138 Mont. 384, 357 P.2d 41, 46.

Appellants here do not have an interest in the conveyance from Lewis to Donald which is injuriously affected by its nullification.

That conveyance has as its subject the cattle owned by Lewis

Cameron and the brand Lewis had registered in only his name. The evidence presented at trial by both parties indicates Lewis and Dale maintained separate herds with separate brands, though the herds may have occupied the same grazing land. It was also testified to at trial that at the time of Lewis's death, he had liquidated part of his herd while Dale had not. It is clear that whatever Lewis did with his cattle had only an incidental effect on Dale, if any effect at all. Thus appellants cannot now raise as an issue in their appeal the possible lack of personal jurisdiction of the District Court over a person, when that Court's judgment as to that person does not in anyway injure appellants.

Judgment of the District Court affirmed.

MR. CHIEF JUSTICE HASWELL and JUSTICES DALY, SHEA and HARRISON concur.