No. 81-61

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

LYCURGUS A. TURLEY and ELNORA FAYE
TURLEY, husband and wife,

                    Plaintiffs and Appellants,

    vs.

GERALD O. TURLEY and PHYLLIS K. TURLEY,
his wife, and JAMES M. TURLEY a/k/a
MICHAEL TURLEY and MAXINE M. TURLEY,
his wife,

                    Defendants and Respondents.

---

Appeal from:  District Court of the Fourteenth Judicial District,
              In and for the County of Musselshell
              Honorable Nat Allen, Judge presiding.

Counsel of Record:

    For Appellants:

        Hennessey Law Office, Billings, Montana
        Joseph P. Hennessey argued, Billings, Montana

    For Respondents:

        Crowley, Haughey, Hanson, Toole & Dietrich, Billings,
          Montana
        George C. Dalthorp argued and Cynthia Ford argued,
          Billings, Montana

---

                        Submitted:  May 14, 1982

                        Decided:  July 22, 1982

Filed: JUL 22 1982

*Thomas J. Kearney*

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiffs commenced this action in September 1978 in the District Court of the Fourteenth Judicial District of the State of Montana, in and for the County of Musselshell, to set aside two quitclaim deeds executed by them in favor of the defendants. The case was tried without a jury and in July 1980 the court found for the defendants. This appeal follows.

Gerald E. and Regina Turley ranched at Musselshell, Montana. They had seven living children at the time of the trial--Edward, Gerald O., Turla, Mike, Francis, Adele and Lycurgus. Gerald O. and Mike, the two defendants, have spent their entire lives working on the ranch. Lycurgus, the plaintiff, went to live with relatives in Texas from age eleven to the completion of high school because he required special attention for his cerebral palsy. Lycurgus returned to the Turley ranch in 1963 and began to work there off and on with his father and his brothers Mike and Gerald O. Lycurgus left the ranch in 1967 and has not lived or worked there since.

The father, Gerald E. Turley, died in 1973. Prior to his death, he established an estate plan by which those sons who worked the ranch would own the surface of the land. He also intended to grant the right to lease the mineral rights to the sons working the ranch, but to reserve to all of the children the right to receive royalties from production. The sons on the ranch were to pay $10,000 to each of their brothers and sisters upon the parents' death. The estate plan was initiated in 1964 when Gerald O. and Mike were the only sons working the ranch. At that time, Gerald O. and

Mike were each deeded an undivided one-sixth of the surface in February 1964. Lycurgus returned to the ranch in June 1964 and was deeded a one-sixth interest in the surface in December 1964. Gerald E. and Regina Turley continued to convey equal interests to Gerald O., Mike and Lycurgus in 1965, 1966, and 1967.

After Lycurgus had left the ranch, the parents continued to deed the surface to Gerald O. and Mike from 1969 to 1973 but did not convey any further interest to Lycurgus. The father, Gerald E., died before the entire plan was carried out and, as a result, none of the mineral interest and all but 2-1/2% of the surface rights had not been deeded. The mineral interest and a small surface percentage became part of the father's estate and thereby passed to his wife and children.

Lycurgus possessed a 24-1/2% interest in the ranch at the date of his final departure from the ranch in 1967. His father wanted him to deed this interest to the sons who were working the ranch. The Turley family lawyer prepared a quitclaim deed from Lycurgus to Gerald O. and Mike. Lycurgus signed the deed on August 18, 1968. The deed quitclaimed Lycurgus's surface rights only.

In that same year, 1968, the Turley ranch was refinanced and a loan was procured from Prudential Insurance Company in the sum of $150,000. This note was signed by the parents, Gerald O., Mike and Lycurgus. When Lycurgus quit-claimed his interest to Gerald O. and Mike, they agreed to assume all the liability of Lycurgus under the promissory note and mortgage to Prudential Insurance Company and to indemnify and hold him harmless from all consequences of his

execution thereof, all according to the language of the quitclaim deed. While Lycurgus's name was not removed from the note, there was no showing that he sustained any damage or detriment as a result. After the action began, the defendants sought to have Lycurgus's name removed from the note, but he refused to upon advice from counsel.

The children of Gerald E. each received an interest in the minerals under the land upon the distribution of Gerald E.'s estate. Gerald O. and Mike requested each of their siblings to quitclaim their mineral interest but to reserve their right to royalties. Lycurgus and his wife executed such a quitclaim deed on March 3, 1977.

Lycurgus later claimed that both the 1968 and 1977 quitclaim deeds were executed as a result of fraud and undue influence and this suit was the result.

The following issues are presented on appeal:

1. Whether the court erred in declaring the 1968 deed valid and in barring the plaintiffs' action for recovery?

2. Whether the court erred in declaring the 1977 deed valid and in barring the plaintiffs' action for recovery?

Four cases are cited by the appellant as authority for this Court to overrule the judgment of the District Court. Denny v. Brissonneaud (1973), 161 Mont. 468, 506 P.2d 77; Merchant's Bank v. Greenhood (1895), 16 Mont. 395, 41 P. 250; Cameron v. Cameron (1978), 179 Mont. 219, 587 P.2d 939; Van Ettinger v. Pappin (1978), ___ Mont. ___, 588 P.2d 988, 35 St.Rep. 1956.

Two of the above cases relied upon by the appellant,

Van Ettinger, supra, and Denny, supra, are not controlling. Van Ettinger establishes nine criteria necessary to show fraud, and failure to establish any one of these elements will result in dismissal. One of these elements is the hearer's reliance on the representation. The record is bare of any evidence of reliance on the part of Lycurgus on statements made to him.

In Denny, supra, involving vendors, a real estate broker and a purchaser of a residence, this Court held that the vendors who accepted cash as an assignment of the purchaser's interest in a note in escrow for their equity in the residence were not entitled to recover from the purchaser and the real estate broker for fraud because vendors received only two monthly payments on the note in escrow. This Court held where there was no proof that the note was valueless, they had not been damaged. Here, as in Denny, the appellant got what he bargained for when he deeded back his interest upon leaving the ranch operation.

Appellant has contended that the trial court is in error for not declaring the 1968 and 1977 deeds invalid. The appellant argues that the confidential relationship, undue influence, fraud, lack of consideration, necessity for rescission, and nonapplicability of the statute of limitations are readily apparent and can be gleaned from the evidence presented at trial.

It is important at the outset of this opinion to reiterate the law concerning the scope of this Court's review of the findings and conclusions of a trial court sitting without a jury. In Cameron v. Cameron (1978), 179 Mont. 219, 587 P.2d 939, when reviewing this area of law, we

stated:

> "'This Court's function in reviewing findings
> of fact in a civil action tried by the dis-
> trict court without a jury is not to substi-
> tute its judgment in place of that of the
> trier of facts but rather it is "confined to
> determining whether there is substantial
> credible evidence to support" the findings of
> fact and conclusions of law. Hornung v.
> Estate of Lagerquist, 155 Mont. 413, 420, 473
> P.2d 541, 546.' Olson v. Westfork Properties,
> Inc. (1976), 171 Mont. 154, 557 P.2d 821,
> 823, 33 St.Rep. 1133.

> "Although conflicts may exist in the evidence
> presented, it is the duty of the trial judge
> to resolve such conflicts. His findings will
> not be disturbed on appeal where they are
> based on substantial though conflicting
> evidence, unless there is a clear preponder-
> ance of evidence against such findings.
> [Citations omitted.]

> "In determining whether the trial court's
> findings are supported by substantial
> evidence, this Court must view the evidence
> in the light most favorable to the prevailing
> party. Hellickson v. Barrett Mobile Home
> Transport, Inc. (1973), 161 Mont. 455, 507
> P.2d 523, 525; Westfork Properties, Inc.,
> supra. 'Substantial evidence' is evidence
> such 'as will convince reasonable men and on
> which such men may not reasonably differ as
> to whether it establishes the [prevailing
> party's] case, and, if all reasonable men
> must conclude that the evidence does not
> establish such case, then it is not substan-
> tial evidence.' Morton v. Mooney (1934), 97
> Mont. 1, 33 P.2d 262, 265; Staggers v. USF&G
> (1972), 159 Mont. 254, 496 P.2d 1161, 1163.
> The evidence may be inherently weak and still
> be deemed 'substantial' and substantial
> evidence may conflict with other evidence
> presented. Campeau v. Lewis (1965), 144 Mont.
> 543, 398 P.2d 960, 962." 587 P.2d at 944-945.

The issues in Cameron, supra, also dealt with fraud
and undue influence. Here, as in Cameron, the trial court's
decision was based upon the judge's resolution of conflict-
ing testimony. We held in Cameron:

> "Much of the evidence presented at trial,
> which the trial judge considered in making
> his findings and conclusions, consisted of
> witnesses' testimony. The credibility of
> such witnesses is of prime importance in this

-6-

appeal. 'The credibility and weight given the witnesses, however, is not for this Court to determine. This is a primary function of a trial judge sitting without a jury; it is of special consequence where the evidence is conflicting. (Citations omitted.)' Hellickson, supra.

". . . We will not substitute our judgment for that of the trier of fact, but rather will only consider whether substantial credible evidence supports the findings and conclusions. Those findings will not be overturned by this Court unless there is a clear preponderance of evidence against them. We will view the evidence in a light most favorable to the prevailing party, recognizing that substantial evidence may be weak or conflicting with other evidence, yet still support the findings. Finally, where the credibility of witnesses is of prime importance, as it is here, the determination of the weight given to the testimony is the primary function of the trial judge sitting without a jury and not that of this Court." 587 P.2d at 945. (Emphasis added.)

Applying the rules of review set out in Cameron, we conclude that the findings and conclusions were supported by substantial credible evidence and the trial court was correct in its judgment.

Appellant argues that a confidential relationship existed between himself and his family and that as a result of this relationship, he was overtly susceptible to their influences. He further maintains that because of this relationship, he failed to seek independent advice before signing the deeds.

The trial court's findings fail to support this contention. The record reveals that the appellant had nothing more, or less, than a normal familial relationship with the other members of his family. The law is clear with respect to what constitutes a "confidential relationship" that may affect the validity of a deed. It is stated at 26 C.J.S. Deeds, section 58 at 751-752:

-7-

"On the other hand, the bare existence of a confidential relation between grantor and grantee does not, standing alone, raise a presumption of fraud, a deed will not be set aside merely because grantor and grantee sustained a confidential relationship where the evidence shows no abuse of confidence; and the mere fact that the grantor later changed his mind will not justify a court in undoing the grant. Mere expression of confidence by the grantor in the grantee does not create a confidential relationship . . ."

Further, independent advise is not a prerequisite to the validity of a deed. 26 C.J.S. Deeds, section 58 at 752-753.

Appellant has also contended that the evidence supports a clear case of undue influence. He cites section 28-2-407, MCA, and Cameron v. Cameron, supra, to support this contention and alleges that the test for undue influence has been completely satisfied by the facts.

Again, the trial court failed to agree and stated that there was no evidence to support this contention. We agree. The test of what undue influence is that is required to set aside a conveyance is set forth in section 28-2-407, MCA, which provides:

"What constitutes undue influence. Undue influence consists in:

"(1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;

"(2) taking an unfair advantage of another's weakness of mind;

"(3) taking a grossly oppressive and unfair advantage of another's necessities or distress."

See, Blackmer: The Presumption of Undue Influence in Montana, 37 Mont. L.Rev. 250 (1976); Orton v. Gray (1970), 285 Ala. 270, 231 So.2d 305; Thomas v. Seaman (1973), 457 Pa. 347, 304 A.2d 134.

The facts of this case do not indicate over the period here involved an intent by any member of the family to take advantage of appellant.

The next argument made by appellant is that the facts presented in the record support a clear case of fraud. He contends that section 28-2-405, MCA, applies and that the facts satisfy the nine part test set out in Van Ettinger v. Pappin, supra. Further, appellant argues that if actual fraud was not established by the facts, then constructive fraud, as defined by section 28-2-406, MCA, is present.

A necessary part of appellant's contention as to whether fraud is present should include a discussion of the applicability of the statute of limitations on fraud, section 27-2-203, MCA. The trial court concluded, and we agree, that section 27-2-203, MCA, as applied here, bars the appellant from even bringing a claim as to fraud with respect to the 1968 quitclaim deed. As this Court held in Israelson v. Mountain Tractors Co. (1970), 155 Mont. 69, 467 P.2d 149:

> ". . . the claim arises upon the occurrence of the fraud and not upon discovery with the exception of the person who can show that the act of fraud was committed under such circumstances that he would not be presumed to have knowledge of them. However, under this exception an obligation rests upon the aggrieved party to present facts to bring himself within the exception. He must show some affirmative act or representation, or its equivalent, designed to prevent and which did prevent here, discovery of facts by him. Too, he must show diligence." 467 P.2d at 152. (Emphasis supplied.)

As for the 1977 quitclaim deed, the evidence does not support the appellant's contention. The appellant did not satisfy all nine parts of the test set out in Van Ettinger, supra. The nine elements from Van Ettinger are as follows:

"1.  A representation;

"2.  Falsity of the representation;

"3.  Materiality of the representation;

"4.  Speaker's knowledge of the falsity of
the representation or ignorance of its truth;

"5.  Speaker's intent it should be relied
upon;

"6.  The hearer's ignorance of the falsity of
the representation;

"7.  The hearer's reliance on the representa-
tion;

"8.  The hearer's right to rely on the repre-
sentation; and

"9.  Consequent and proximate injury caused
by the reliance on the representation." 588
P.2d at 994.

As previously noted at the time of the father's death in 1973, all of the land except 2-1/2 percent of the surface rights had been distributed to the sons, Gerald O. and Mike, according to the previously set up estate plan. Regina Turley, mother of the children, testified at length about the ranch, the estate plan, the reasons for leaving the property in the manner it was done, and the problems that resulted.

Mrs. Turley, at the time she testified, was a woman of seventy-three years, who was caught in a family dispute over property arrangements made some years before to preserve the ranch. She testified that her husband was the dominating member of the family on business matters and that she went along with him on decisions made to preserve the ranch. She testified she went with him to see Mr. Kilbourne at the time the estate plan was set up and that she went along with her husband's plans to give the surface rights of the ranch to the boys who stayed on the ranch. The testimony

indicates she agreed that the boys who worked the ranch should benefit and that when Lycurgus left, she was aware that her husband went to Two Dot to get Lycurgus to sign the quitclaim of the interest given him when he returned to the ranch for a short period. From her testimony, confused as it was, it can be seen that the problem of who got the ranch was an upsetting problem in the family, but the record fails to indicate such influence by the father or brothers that warrants setting aside the deeds.

Here, the appellant failed to prove that any fraud existed. First, it is doubtful whether the representation made to the appellant concerning the necessity of the signatures on the 1977 quitclaim deed was anything but good business practice, much less false. Second, the appellant did not prove that his brothers, Gerald and Mike, nor his mother, knew that the representations were anything but true. Third, the appellant did not have to rely on the information that was given him. As this Court stated in Van Ettinger, supra, 588 P.2d at 994:

> "Appellants could not rely on the alleged representations of respondents as a matter of law. In Lee v. Stockmen's National Bank (1922), 63 Mont. 262, 284, 207 P. 623, 630, it was stated:
>
> "'When it appears that a party, who claims to have been deceived to his prejudice, has investigated for himself or that the means were at hand to ascertain the truth . . . of any representations made to him, his reliance upon such representations made to him, however false they may have been, affords no ground of complaint. (Grindrod v. Anglo-American Bond Co., 34 Mont. 169, 85 P. 891; Power & Brothers v. Turner, 37 Mont. 521, 97 P. 950; 26 C.J. 1149.)' (Emphasis added.)"

We note that the District Court did not make specific findings on the issue of constructive fraud. Constructive

fraud is defined by section 28-2-406, MCA, as follows:

"Constructive fraud consists in:

"(1) Any breach of duty which, without any actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to this prejudice or to the prejudice of anyone claiming under him; or

"(2) Any such act or omission as the law especially declared to be fraudulent, without respect to actual fraud." (Emphasis added.)

The record fails to set forth any facts showing that the appellant was misled by the respondents. The record does not show any act on the part of the respondents declared by law to be fraudulent. We therefore conclude that the appellant has failed to prove constructive fraud.

The facts and law do not support appellant's contention that there was no consideration for either deed. Section 70-1-502, MCA, provides: "A voluntary transfer is an executed contract subject to all rules of law concerning contracts in general, except that a consideration is not necessary to its validity." Also, at 13 Am.Jur.2d Cancellation of Instruments, section 25 at 519-520, we find: "The rule is clear that inadequacy of consideration is not, in itself, a sufficient ground for cancellation of any agreement or instrument, including a deed."

From the facts we find that consideration was indeed present. The appellant's brothers agreed to hold him harmless on the promissory note from Prudential Insurance Company if he signed the quitclaim deed. The fact that the appellant's name was mistakenly not taken off the note is irrelevant in light of the hold harmless clause of the 1968 quitclaim deed and the fact that appellant was never asked to pay on the note. As for the 1977 quitclaim deed, the

-12-

appellant received a $2,500 down payment from his brothers who promised to pay an additional $7,500 to appellant when their mother dies. The respondents have been paying the premiums on a life insurance policy that is in their mother's name. The proceeds of the policy will pass to the appellant and his siblings, other than Gerald and Mike, in return for the signature on the 1977 quitclaim deed.

Appellant's contention that both quitclaim deeds should be rescinded because they come under section 28-2-1711, MCA, is unfounded. The cited section is not applicable to the facts of this case. First, our statutes do not require consideration for the transfer of property. Section 70-1-502, MCA, voluntary transfer--applicability of contract, rules:

> "A voluntary transfer is an executed contract subject to all rules of law concerning contracts in general, except that consideration is not necessary to its validity."

In addition, here evidence clearly showed appellant was to be indemnified for signing and that would be sufficient consideration.

Appellant's final contention is that his action as to the 1968 quitclaim deed is not barred by the statute of limitations. Again, this assertion is not supported by either the facts or law. Both parties agreed that section 27-2-203, MCA, is controlling on this point. Section 27-2-203, MCA, provides:

> "Actions for relief on ground of fraud or mistake. The period prescribed for the commencement of an action for relief on the ground of fraud or mistake is within 2 years, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake."

The case law interpreting when the statute of limitations begins to run is quite clearly in favor of the respondents. In Israelson v. Mountain Tractors Co., supra, we held that statute begins to run when the fraud occurs and the only exception to this is if there was an affirmative act to prevent a person from discovering the fraud. This Court in Israelson, supra, cited Kerrigan v. O'Meara (1924), 71 Mont. 1, 227 P. 819, which contains the following language:

> "There must be some active affirmative concealment of the fraud, something said or done to continue the deception or to prevent inquiry and lull the plaintiff into a sense of security, in order to postpone the running of the statute. . .

> "As a general rule, the statute of limitations begins to run from the time the right of action accrues, and not when the plaintiff who is ignorant before comes to a knowledge of his rights . . .

> "Now the word 'discovery' as used implies that the facts have been concealed from the party relying upon the exception. 'Discovery' and 'knowledge' are not convertible terms, and whether there has been a discovery of the facts constituting the fraud within the meaning of the statute is a question of law to be determined from the facts proved. It is not enough for the plaintiff merely to say he was ignorant of the facts at the time of their occurrence, and has not come into knowledge of them until within two years. He must show that the acts of fraud were committed under such circumstances that he would not be presumed to have knowledge of them, it being the rule that <u>if he has 'notice of information of circumstances which would put him on inquiry which if followed would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have had actual knowledge of the facts.</u>

> ". . .

> "The fact that a person entitled to an action has no knowledge of his right to sue, or of the facts out of which his right arises, does not, as a general rule, prevent the running of the statute, or postpone the commencement of the period of limitation, until he

discovers the facts or learns of his right thereunder. Nor does the mere silence of the person liable to the action prevent the running of the statute. To have such effect, there must be something done to prevent discovery--something which can be said to amount to concealment . . .

"Ignorance of right, there being no more than mere passiveness, mere silence, on the part of his adversary, cannot be engrafted as an exception on the statute of limitations, without a destruction of its wise policy, and without an encouragement of mere negligence. [Citations omitted; emphasis supplied.]" 227 P. at 821.

Appellant did not bring this claim until ten years after the 1968 quitclaim deed was signed. The testimony did not reveal an affirmative act on the part of respondents or any member of appellant's family. Clearly, the law cannot be stretched to accommodate a party who sits on his rights for so long. The doctrine of laches would bar the appellant's claim if there was any doubt as to the applicability of section 27-2-203, MCA.

In summary, this case can be quite easily capsulized. It is apparent from the testimony that the appellant was aware of the original purpose behind the quitclaim deeds. He knew that his father's plan was to give the ranch to those members of the family who chose to stay and work on the ranch. The respondents have worked the ranch for their entire lives; the appellant was there approximately three years.

The judgment is affirmed.

_____
                    Justice

-15-

We concur:

_____
          Chief Justice

_____

_____

_____
          Justices

_____
Hon. Frank E. Blair, District
Judge, sitting in place of Mr.
Justice John C. Sheehy

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent.

The majority opinion correctly notes that appellant relies upon the existence of a confidential relationship routed in family as a basis for constructive fraud allegations. The crux of this argument is that appellant, because of his weak physical and mental condition, was dependent for financial advice upon his father and brothers. If appellant indeed were found to have reposed special trust and confidence in defendants,a breach of such trust could form the basis for constructive fraud relief.

The majority states "The trial court's findings fail to support this contention." However, the trial court made no findings with respect to constructive fraud. Therefore, I would remand this case to the District Court with directions to make findings.

_____
          Justice