No. 82-517

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

RUSSELL LACEY and ROBERTA LACEY,

Plaintiffs and Appellants,

-vs-

JOHN C. HERNDON and BLAINE COUNTY,

Defendants and Cross-Plaintiffs
and Respondents,

-vs-

LEO KRAFT,

Cross-Defendant.

APPEAL FROM:   District Court of the Twelfth Judicial District,
               In and for the County of Blaine,
               The Honorable B. W. Thomas, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

            Moses Law Firm; Michael G. Moses, Billings,
            Montana

      For Respondents:

            Smith, Baillie & Walsh, Dennis P. Clarke, Great Falls,
            Montana
            J. Chan Ettien, Havre, Montana

                              Submitted on Briefs:   April 8, 1983

                                         Decided:   August 24, 1983

Filed:  AUG 2 4 1983

                    _____
                                Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from a judgment of the District Court of the Twelfth Judicial District, Blaine County, against plaintiffs, Russell Lacey and Roberta Lacey, and in favor of defendants, Blaine County and John C. Herndon, Blaine County Sanitarian. We affirm the judgment.

The Plainsman Bar is located in Chinook, Montana. Defendant Leo Kraft was the owner of the property, which consisted of a building, personal property located in it, a tract of land, and a Montana liquor license authorizing operation of a 50-seat bar.

Les Stevenson, who contemplated purchasing the Plainsman Bar from Leo Kraft, began operating the business in November, 1978. The Blaine County Sanitarian, John C. Herndon, inspected the bar. He told Stevenson that engineering plans to expand the sewer system would have to be submitted before expansion of the business would be approved. Stevenson experienced sewer backup in the bar and problems with the water pressure from the well.

On November 30, 1978, Herndon reported by letter to the Chief of the Department of Revenue, Liquor Control Board and the Chief of the State Board of Health that the Plainsman Bar water supply was inadequate and that the liquor license transfer should not be granted. Herndon noted that Stevenson's proposed addition of a kitchen and steakhouse in the same building would completely deplete the existing water supply. He reported that the sewage treatment system consisted of a 1,500-gallon septic tank and a surface drainfield of 800 square feet, capable of disposing of sewage from the bar and one trailer house. Herndon concluded that an engineering study should be conducted and an additional disposal system installed before a restaurant could be licensed on the premises.

2

Copies of the Herndon letter were mailed to Les Stevenson, his attorney, and Leo Kraft's attorney. Acting on behalf of Stevenson, attorney Ted Thompson obtained a release from the sales agreement between Stevenson and Kraft. During the period that Stevenson operated the Plainsman Bar, Stevenson did not tell John Herndon about the sewer and water problems he experienced.

On March 7, 1979, Leo Kraft listed the Plainsman Bar for sale with Flynn Realty. Appellant Russell Lacey, a retired ironworker from Anchorage, Alaska, had been looking for a bar and restaurant business in the western United States. Lacey inquired at Flynn Realty and was told about the Plainsman Bar.

Relying on telephone conversations about the bar, Mr. Lacey traveled from Anchorage to Havre to view the Plainsman property. Two agents of Flynn Realty represented to Lacey that the building itself was suitable for conversion to a 250-person restaurant and that the septic tank was large enough to handle such a restaurant. The listing agreement with Flynn Realty contained no information regarding the actual capacity of the septic tank, nor mention of the fact that the liquor license authorized only a 50-person bar. Based upon identical representations made in a long-distance telephone conversation with Flynn Realty agents, Roberta Lacey and her son-in-law traveled from Anchorage to Havre to inspect the Plainsman property.

Plaintiffs became interested in the Plainsman property because they thought they could operate it as both a bar and a restaurant. The floor space of the Plainsman would accommodate 200 bar patrons. A partially equipped kitchen had been operated as a sandwich and buffet facility. Plaintiffs knew they would have to purchase additional equipment to operate a full-service restaurant. The Flynn Realty agents

3

were aware of plaintiffs' plan to expand the existing facilities. Kenneth R. Flynn confirmed his agents' representations that the Plainsman had a 4,000 gallon septic tank sufficient to handle a 250-person bar and restaurant.

During one of plaintiffs' visits to the Plainsman Bar, plaintiffs and Flynn Realty agents observed a plumber's snake and debris lying near a drain. The Flynn Realty agents assured plaintiffs that the sewer problem would be corrected and added a provision to the buy-sell agreement that the plugged drain would be opened and the sewer would be in "good, workable condition."

On April 9, 1979, plaintiffs executed a "Receipt and Agreement to Sell and Purchase" in which they agreed to purchase the Plainsman Bar from Leo Kraft. On May 9, 1979, agents of Flynn Realty escorted Russell Lacey to attorney Thompson's office. They explained that the buy-sell agreement had been signed, that the terms and conditions of the sale were already set, and that they would like Thompson to review the contract for sale, which Leo Kraft's attorney had prepared. Thompson agreed to represent the Laceys and advised them of the existence of John Herndon's November 30, 1978 letter, regarding sewer and water problems at the Plainsman Bar.

Testimony regarding the extent to which Thompson explained the contents of Herndon's letter to the Laceys is contradictory. Thompson testified that he went over the letter sentence by sentence. Roberta Lacey testified that Thompson did not tell them about Herndon's reference to the 1,500-gallon septic tank or the need for an engineering study and expanded sewer system. Russell Lacey could not recall specifically what Thompson discussed relative to the letter, but testified that Thompson "checked with John Herndon to see if this had been corrected." Roberta Lacey also testified

4

that Thompson called Herndon to make sure the sewer problems had been corrected before they signed the contract for sale.

Some time after his May 9, 1979 meeting with the Laceys and the Flynn agents, Thompson telephoned Herndon to find out whether the conditions outlined in Herndon's November 30, 1978 letter still existed. Thompson testified that Herndon assured him that the water supply was adequate for a restaurant and bar with an occupancy load of 250 people; that the sewer system problems had been corrected; and that Herndon would check again to make certain there were no sewer problems more serious than the minor blockage, evidenced by the sewer snake the Laceys had seen. Herndon told Thompson "he would check his file to see if there were any problems other than a minor stoppage." Thompson admitted that he did not discuss the size of the septic tank with Herndon or whether the sewer system had been enhanced since 1978.

Herndon testified that he was unable to contact Les Stevenson, but that he talked to the Plainsman Bar manager and plumbers, who reported that the problems had been corrected. Herndon relayed this information to Thompson on May 18, 1979.

Thompson testified he advised plaintiffs to wait until the food purveyor's license was issued before signing the contract for sale. Contrary to Thompson's advice, plaintiffs executed the contract for sale of the Plainsman property with Leo Kraft on May 18, 1979. Plaintiffs made a $35,000 downpayment and contracted to pay $135,000 in monthly payments. The contract for sale was contingent upon transferability of the Montana Retail Beer and Liquor License, but no conditions regarding capacities of the water or sewer systems were expressed. The agreement also provided that plaintiffs had entered into the agreement in full reliance on their independent investigation.

5

On June 20, 1979, the State Department of Health & Environmental Sciences issued a food purveyor's license to plaintiffs. Herndon testified that the license was issued so that plaintiffs could sell "knick knack foods" from the bar as Kraft had. According to Russell Lacey's testimony, the bar was opened in July, kitchen equipment was installed, and the restaurant opened in August. Roberta Lacey testified the restaurant opened in October. The Laceys did not seek formal approval from the State before installing the kitchen equipment. Herndon conducted a fire inspection of the new kitchen equipment.

Plaintiffs experienced a serious backup problem the first day the restaurant opened and requested that Herndon inspect their sewage system. Herndon did so and several meetings between Herndon, Kraft and plaintiffs took place. Plaintiffs continued to report sewer problems to Herndon.

Herndon informed plaintiffs by letter dated January 22, 1980 that the sewage system was "a complete failure." Copies of this letter were forwarded to attorney Thompson, the State Food & Consumer Safety Bureau, the State Liquor Control Board, and the engineering firm whose construction plans had not been adhered to when the Plainsman Bar was built. Herndon recommended that in order for the Plainsman Bar "to comply with the Montana State Health Codes for a Bar and Steakhouse, it will be necessary to revamp the entire sewage system." He noted that review of engineering plans and specifications for design, as well as approval of the facility had to be completed before a license would be granted for an eating establishment.

By letter dated January 29, 1980, the Liquor License Bureau informed plaintiffs that their health permit was in jeopardy of being revoked unless they corrected the sewage system deficiency. On February 8, 1980, John Herndon wrote

6

the Liquor License Bureau Chief that the sewage disposal system of the Plainsman Bar did not comply with the minimum standards of the State Department of Health & Environmental Sciences. On February 14, 1980, James Peterson of the Food & Consumer Safety Bureau of the Department of Health and Environmental Sciences informed Russell Lacey by letter that the sewage system was approved for a 50-seat bar operation only. Peterson noted that the installed system was "not entirely as submitted and approved" and requested that Mr. Lacey furnish "as-built" data on the existing sewer system. Copies of Peterson's letter were forwarded to John Herndon and the Liquor Control Division.

Herndon outlined a list of 13 violations in the Plainsman Bar and steakhouse in a letter dated March 17, 1980 to Lee Williams of the Liquor Control Division and James Peterson of the Department of Health and Environmental Sciences. Plaintiffs failed to correct the violations.

Plaintiffs sued a number of parties. Nault Plumbing & Heating, James M. Peterson and State of Montana were granted summary judgments in their behalf. Plaintiffs, Leo Kraft and Flynn Realty stipulated that the claims had been fully settled by an agreement under which the plaintiffs received $47,500 and returned the bar to Leo Kraft. Following the dismissals with prejudice, plaintiffs' remaining claim for relief was against John Herndon and Blaine County, for fraud in the inducement and negligent misrepresentation.

After trial, the district court concluded that plaintiffs' failure to argue the theory of negligent misrepresentation indicated to the court an intention to abandon that theory. Judgment in favor of Herndon and Blaine County was entered.

The issues presented on appeal are:

7

(1) Are the findings of fact, conclusions of law, and judgment supported by substantial evidence?

(2) Are the findings of fact, conclusions of law, and judgment clearly erroneous?

Plaintiffs challenge 8 of the district court's 38 findings of fact and 1 conclusion of law. Plaintiffs contend that, in viewing the entire record, the findings of fact are clearly erroneous and not supported by substantial, credible evidence. Defendants contend that plaintiffs have not shown abuse of discretion merely by quoting favorable portions of conflicting testimony.

The challenged conclusion of law states:

"Plaintiffs have failed to prove their claims of fraud and negligent misrepresentation against defendants John Herndon and Blaine County."

We look to the evidence and the findings of fact to determine whether this conclusion is supported by substantial credible evidence.

On appeal, we will not disturb findings of fact that are based on substantial evidence. "The evidence may be inherently weak and still be deemed 'substantial' and substantial evidence may conflict with other evidence presented." Cameron v. Cameron (1978), 179 Mont. 219, 228, 587 P.2d 939, 945. Rule 52(a), M.R.Civ.P. states in part:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

In reviewing findings of fact in a civil action tried without a jury, this Court may not substitute its judgment in place of the trier of facts. Our function is confined to determining whether there is substantial credible evidence to support the court's findings. We view the evidence "in a light most favorable to the prevailing party, recognizing that substantial evidence may be weak or conflicting with

8

other evidence yet still support the findings." Wallace v. Wallace (1983), ____ Mont. ____, 661 P.2d 455, 457, 40 St.Rep. 430, 433, citing In Re Marriage of Bosacker (1980), ____ Mont. ____, 609 P.2d 253, 256, 37 St.Rep. 469, 471. It is the duty of the trial court to resolve such conflicts.

Applying the above rules of review, we turn first to the question of the sufficiency of evidence supporting each challenged finding of fact. Plaintiffs allege findings of fact 21, 22, 24, 31, 32, 33, 35 and 37 are clearly erroneous. Findings 21 through 24 concern discussions between attorney Thompson and sanitarian Herndon.

Finding of Fact 21 states:

"Thompson and Herndon did have at least two discussions relating to the Plainsman Bar. One occurred on May 9, 1979, and another on May 18, 1979, the date when the final agreement was entered into by plaintiffs. In those conversations, Herndon was discussing the facility as it existed at that time, served by a 1,500 gallon septic tank and licensed for a 50-seat bar. However, he did not advise Thompson of that license restriction, nor did Thompson inquire about any restriction."

In substance, Thompson testified that Herndon represented to him that the sewer system would handle the expanded facility, but admitted that he did not discuss the septic tank size or ask whether the original tank had been replaced. Herndon testified he was referring to existing conditions when he advised Thompson that he saw no problem in issuing a license on the (50-seat) bar. The finder of fact chose to believe Herndon's testimony regarding the misunderstood communication. There is sufficient evidence to support finding of fact 21.

Finding of Fact 22 states:

"In the conversations mentioned in Finding 21, some of the problems set out in Herndon's November 30, 1978 letter were discussed. Herndon stated the well problems had been fixed and that there was an adequate water supply. Ted Thompson did not discuss the fact that the letter said the bar had a 1,500 gallon septic tank or have any discussion with John Herndon regarding the size of the

9

existing septic tank or any discussion that the existing septic tank had been replaced. John Herndon told Ted Thompson that an engineering study was not necessary. Herndon said this because he was referring to an existing facility. Ted Thompson assumed the existing facility had been expanded but was not told this by Herndon. Thompson knew an engineering study had not been filed with the Liquor Division but did not inquire further."

Again the evidence is directly contradictory. Thompson testified he reviewed the letter of November 30, 1978 with Herndon sentence by sentence. Herndon denied this and testified that they discussed such things as the food purveyors' license and the water and sewer problem of May 9. Herndon contacted the manager and plumbers to see if the backup problem had been corrected and reported what he had learned to attorney Thompson. A finding is not clearly erroneous because one witness testifies to the contrary. There is substantial evidence to support the court's finding.

Finding of Fact 24 states:

"In response to an inquiry from Thompson, Herndon told Thompson that the bar had a capacity of 250 persons. By that, he had in mind that the place had a floor or load capacity of 250 persons. He did not understand from his conversations with Thompson that the Laceys planned to expand the bar to a restaurant operation for 250 persons. The evidence is insufficient to find that Herndon represented to Thompson that the existing sewer system had the capacity to handle a 250-person restaurant, although Thompson may have understood him to so state."

In substance, Thompson testified that Herndon represented to him that the sewer system and water would handle the expanded facility, although he admitted he did not inquire whether the existing sewer system had been expanded. Herndon's testimony, on the other hand, established that he told Thompson that the bar had the floor space for 250 people, but that he had received no plans for expansion of the existing facility.

10

Plaintiffs contend that the following testimony constitutes an admission by Herndon that he told Thompson the sewer system could handle a 250-person facility:

"Q. Did you advise him as you testified on your direct examination that this facility had a capacity of 250 people? A. I had it that ---

"Q. Did you say that? A. No.

"Q. So -- didn't you say on direct examination that you told Mr. Thompson that it had a capacity of 250 people? A. No, I did not. I said it had the floor capacity.

"Q. For what, for how many people? A. For 250.

"Q Then there would be no question that you told him that this place had a capacity of 250 to 300 people and that the sewer system was satisfactory?

"MR. CLARK: I don't believe that is his testimony.

"Q. I don't know if that is his testimony or not, I am asking him if that is his testimony? A. I was more or less -- he was more or less licensed to set up for the existing set up. The sewer had the capacity and the floor space for that.

"Q. But you did tell Mr. Thompson those two things? A. I must have."

Taken in context, the alleged admission that Herndon "must have" told Thompson that the sewer had the capacity for 250 people could also be interpreted as a statement that the sewer and floor space were adequate "for the existing set up." This interpretation is consistent with the rest of Herndon's testimony.

Plaintiffs assert the fact that Herndon issued a license to them is evidence of Herndon's knowledge of their restaurant expansion plan. However, a food purveyor's license was required in order for the Laceys to continue to sell sandwiches as their predecessors had. Issuance of the license fails to show that Herndon had knowledge of plaintiffs' plan to expand the bar to a restaurant of 250 person capacity.

11

We conclude that the evidence is insufficient to show that Herndon represented that the existing system had a capacity to handle a 250 person restaurant, even though Thompson may have so misunderstood him.

Finding of Fact 31 states:

"No evidence was presented that defendant John Herndon intentionally made any representations to plaintiffs or their attorney which were false."

Plaintiffs assert that Herndon intentionally made false representations to Thompson regarding the capacity of the bar and of the sewer system. Herndon's testimony is replete with references to his understanding that his discussions concerned the existing facility and not a proposed plan for expansion.

We will not burden this opinion with an extensive review of all of the testimony. There is clearly sufficient evidence to support the court's finding. In addition, according to James Peterson, sanitarian with the State Department of Health and Environmental Sciences, Herndon lacked authority to inspect sewer systems to determine compliance of proposed plans with code requirements.

Thompson's testimony as to his understanding that Herndon agreed to inspect the system does not constitute a clear preponderance of evidence that Herndon intentionally made false representations. Finding of Fact 31 is adequately supported.

Finding of Fact 32 states in part:

" . . . John Herndon first learned of the kitchen installation plans in late summer of 1979."

Plaintiffs argue that this finding is contrary to Thompson's testimony and to Herndon's issuance of a food purveyor's license on June 20, 1979.

Herndon testified that the initial license was issued based on the assumption that the Plainsman kitchen would

12

continue to serve sandwiches. He testified that he did not know until after the issuance of that license that the plaintiffs planned a full restaurant. The testimony is sufficient to support Finding of Fact 32.

Finding of Fact 33 states:

"Plaintiffs experienced no serious trouble with the sewer system until October, 1979 when the restaurant was opened and the sewer backed up and flooded parts of the Plainsman building."

Plaintiffs challenge this finding on the basis of Russell Lacey's testimony that the Plainsman Bar flooded August 3, 1979. However, Roberta Lacey characterized the August backup problem as minor and testified that serious trouble began in October:

"Q. You had a major backup in August, is that right. A. It wasn't a major one. The major one was in October."

Again, there is substantial evidence to support the finding.

Find of Fact 35 states in part:

" . . . After the Laceys discovered the facts set out in Finding Number 32, Herndon was asked by Russell Lacey to write letters which would help his case against Leo Kraft."

Plaintiffs assert this finding is clearly erroneous because it includes a statement which was stricken from the record on the first day of trial. However, on the third day of trial, Herndon was asked essentially the same question and his answer remains part of the record. Herndon's testified that a request was made of him to write letters which would help the Laceys make a case against Leo Kraft. A review of the evidence shows that plaintiffs were anticipating suing Leo Kraft at the time Lacey asked Herndon to write the letters. There is substantial evidence to support the finding.

Finding of Fact 37 states:

13

"The damages sustained by plaintiffs according to admissible evidence, relevant to any statements made by John Herndon, are as follows:
(a) Future Electric Company for the installation of wiring for kitchen equipment - $681.47;
(b) Equipment purchased for the installation of the kitchen (purchase price of $9,380.58 less current value of $4,500.00 =) $4,880.58;
(c) Printing menus - $50.00."

As we review the evidence, we do find indications that additional damages may have been adequately proved by the plaintiffs. However, we note that in its pre-trial order, the trial court ruled that the Laceys had to prove damages in excess of the $47,500 settlement received from Kraft and Flynn Realty. The evidence does not show that plaintiffs met that burden. We will, therefore, not review the damage evidence in detail. We hold there is substantial evidence to support the conclusion of the district court. "This Court will not reverse or remand a decision of the District Court when the eventual result in the District Court must be the same." Kirby Co. of Bozeman v. Employment Sec. (1980), 614 P.2d 1040, 1043, 37 St.Rep. 1255, 1258, citing Green v. Green (1978), 176 Mont. 532, 579 P.2d 1235.

Finally, plaintiffs challenge Conclusion of Law 3, which states:

"Plaintiffs have failed to prove their claims of fraud and negligent misrepresentation against defendants John Herndon and Blaine County."

There was a plethora of evidence proving misunderstanding between Herndon and Thompson, but like the trial court, we find no evidence that John Herndon made false representations upon which he intended the Laceys to rely. Thus, plaintiffs failed to prove their claim of fraud.

Plaintiffs argue that even if the court determined that Herndon's representations were not sufficient to constitute fraud, they were clearly negligent. As previously mentioned, the district court concluded that plaintiffs' failure to

14

argue the theory of negligent misrepresentation indicated an abandonment of that theory. We also note that plaintiffs proposed no finding of fact or conclusion of law regarding negligent misrepresentation to the district court. This Court will not review a matter to which no argument has been directed at the lower court level. Sands v. Nestegard (1982), ____ Mont. ____, 646 P.2d 1189, 1193, 39 St.Rep. 1101, 1105. The court found no false misrepresentation had been proved. There is substantial evidence to support the conclusion on the part of the district court.

A careful review of the evidence has resulted in our conclusion that the findings of fact, conclusions of law and judgment of the district court are supported by substantial evidence and are not erroneous.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

15