No. 85-08

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

AETNA LIFE INSURANCE COMPANY,
a corporation,

        Plaintiff and Appellant,

-vs-

R. J. McELVAIN, JR., et al.,

        Defendant and Respondent.

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and for the County of Fallon,
The Honorable Alfred B. Coate, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Dorsey & Whitney; James Dorsey argued, Minneapolis,
Minnesota

    For Respondent:

        Huntley & Eakin; Gene Huntley argued, Baker, Montana

Submitted: November 6, 1985

Decided: April 22, 1986

Filed: APR 22 1986

_____
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Aetna Life Insurance Company (Aetna) appeals the lower court's order in this case originally brought by Aetna to foreclose on its first mortgage on certain Montana farmland. The Fallon County District Court ruled that Aetna could foreclose but held that Aetna had defrauded respondents Shepherds, the second mortgagees. The court awarded Shepherds the first $149,821.19 (plus $40,000 for attorney's fees) from the foreclosure sale of the ranch. This appeal raises issues of whether a South Dakota district court judgment collaterally estops Shepherds from successfully relitigating the issue of Aetna's alleged fraud; whether Shepherds had actual or constructive notice of the fraudulent scheme, which precludes them from recovering for fraud; whether Western Farm Management Company (Western Farm), a loan broker, was the agent of Aetna and, if so, whether the fraudulent acts of Western Farm are imputable to Aetna. We conclude that Shepherds cannot successfully allege fraud on Aetna's part because the South Dakota judgment collaterally estops them from relitigating this issue and because Shepherds had imputed knowledge of the fraudulent scheme. Thus, we reverse the District Court and remand this case for the entry of judgment in Aetna's favor.

In 1979, Shepherds owned the Box Elder Ranch, which lies at the juncture of Montana, South Dakota and North Dakota and includes land in all three states. Shepherds, desiring to sell the ranch, listed it for sale with Ranch Mart, a realty agency, and employed Ranch Mart to find a buyer. In May 1979, McElvains agreed to buy the ranch and

signed a buy/sell agreement. The agreement was contingent upon McElvains securing financing from Aetna for the purchase. The total sales price agreed upon was $1,385,000; $1,235,000 as payment for the ranch and $150,000 as payment for ranch machinery. Under the agreement, McElvains were to pay $1,100,000 in cash at the closing after securing a loan from Aetna in that amount. Shepherds agreed that Aetna would have the first mortgage (from McElvains) on the ranch with the understanding that Aetna's loan to McElvains would be for $1,100,000 and would not exceed that amount. The balance of the purchase price was to be secured by a second mortgage on the ranch from McElvains to Shepherds. Shepherds would not have entered this transaction if they had known that Aetna's loan to McElvains (and resulting mortgage) would be for an amount well in excess of $1,100,000.

R.J. McElvain, Jr., one of the prospective buyers of the ranch, worked for Western Farm. Western Farm was a loan broker, helping people to arrange loans. R.J. McElvain, Jr., sought the help of a fellow Western Farm employee in arranging financing for McElvains' purchase of the ranch. Western Farm agents contacted Shepherds at the ranch to inspect and appraise the property. Western Farm, through its agents and McElvains, knew that the agreed upon sales price was $1,385,000 and that the sale was contingent upon an Aetna loan to McElvains for $1,100,000.

The mortgage loan application to Aetna, submitted in McElvains' name through Western Farm, stated that the total sales price for the ranch was $2,185,000. The application requested a loan from Aetna of $1,555,000. A forged buy/sell agreement was also submitted to Aetna through Western Farm.

3

Shepherds' signatures were forged on the agreement. The agreement stated that the total sales price was $2,185,000. R.J. McElvain, Jr., who had worked for Western Farm, stated at deposition that the forged buy/sell agreement was seen in the offices of Western Farm. Aetna approved a loan in the total amount of $1,555,000. The effect of the loan was that Aetna would have a first mortgage for $1,555,000 on a ranch valued at approximately $1,235,000. Thus, Shepherds' second mortgage for $135,000 was rendered essentially worthless.

On July 6, 1979, McElvains and Shepherds closed the sale of the ranch. McElvains executed a promissory note to Shepherds for $135,000, secured by three separate second mortgages on ranch property in the three states. The documents were backdated to June 29, 1979. The closing took place after Ranch Mart, Shepherds' agent, received notice that Aetna had approved the loan to McElvains. At his deposition, Wallace Mading, owner of Ranch Mart, produced a copy of a letter received by Ranch Mart. The letter, from Western Farm to R.J. McElvain, Jr., stated that the Aetna loan had been approved for $1,550,000. The letter was dated June 7, 1979. Mading stated at deposition that neither he, his secretary, nor the closing agent knew when the letter was received by Ranch Mart. Ranch Mart received the letter in response to its request to Western Farm to notify Ranch Mart of the approval of the loan. Mading agreed that, in terms of Ranch Mart's normal practice, Ranch Mart had received the letter before the closing on July 6, 1979.

Mading testified at deposition:

> . . . I am sure that I was aware that Aetna Life Insurance Company was going to be in a million and a half dollar

4

                    mortgage position, but I did not know
                    what all on . . . I knew that this
                    property was certainly a part of it.

                    Q. You did know then that they were
                    going to have a mortgage in excess of a
                    million and a half dollars, and that
                    their mortgage would be superior to the
                    second mortgage of the Shepherds?

                    A. Yes, I am sure that I would have, I
                    would have been aware of it just the way
                    you said it.

Ranch Mart apparently did not tell Shepherds about the size

of Aetna's loan to McElvains.

On August 2, 1979, Aetna closed its loan to McElvains

for $1,555,000. McElvains executed three promissory notes

totaling that amount and three mortgages (to secure the

notes) in Aetna's favor. The transaction required three

mortgages and three notes so that a mortgage could be

recorded in each one of the three states in which the ranch

is located. These first mortgages were recorded August 2,

1979, in the appropriate office of the respective counties

and states.

Shepherds recorded the three second mortgages as

follows: on November 29, 1979, in Fallon County, Montana; on

November 30, 1979, in Bowman County, North Dakota; and on

December 3, 1979, in Harding County, South Dakota. These

mortgages explicitly recited that they were subordinate to

Aetna's first mortgages. On January 24, 1980, Shepherds

filed a satisfaction of mortgage for each of the three

mortgages given to Shepherds by McElvains, although the

underlying debt had not been paid. Shepherds filed the

satisfactions of mortgage on the request of their realtor,

Wallace Mading. Ronald Shepherd testified that Mading's

reason for this was that Shepherds had mistakenly filed their

mortgages ahead of Aetna and "they had to have it reversed." This reasoning apparently reflects that (1) part of Aetna's loan to McElvains was not to be disbursed until on or before February 28, 1980 (Shepherds' mortgages having been recorded in November and December of 1979); and (2) Aetna sought to amend its mortgages to show this disbursement (although this was not shown at trial). In any event, Shepherds filed three satisfactions of mortgage and then, in March 1980, filed three new second mortgages (otherwise identical to their prior mortgages) on the ranch land in the three states. These new second mortgages also explicitly recited that they were junior and subordinate to Aetna's first mortgage.

McElvains were in default under the terms of the second mortgage as soon as the first payment became due. Upon McElvains' default on the second mortgage to Shepherds, Shepherds foreclosed the mortgage on the Montana property and purchased the Montana property at a sheriff's sale. Shepherds' received a sheriff's deed to this property after the period of redemption had passed.

McElvains also defaulted on the three senior mortgages to Aetna. On July 10, 1981, Aetna filed this foreclosure action in Montana District Court, Fallon County, on the Montana mortgage. In August 1981, Aetna filed a foreclosure action in South Dakota on the South Dakota mortgage. Aetna filed a similar action in North Dakota on the North Dakota property. The North Dakota court entered summary judgment by default against Shepherds in October 1983. In July 1984, the North Dakota Supreme Court dismissed Shepherds' appeal of the summary judgment order.

6

In the South Dakota action, Shepherds raised a defense alleging that Western Farm was the agent of Aetna and, as such, induced Shepherds to sell the ranch through fraudulent misrepresentations that Aetna would loan McElvains $1,100,000 and take a mortgage for that amount. Shepherds asserted that because Aetna loaned McElvains $1,555,000 and got a first mortgage in that amount, when the value of the ranch was substantially less than the amount of the first mortgage, Aetna fraudulently rendered Shepherds' second mortgage valueless. Shepherds also claimed that Western Farm defrauded them by submitting a forged buy/sell agreement to Aetna which inflated the true sales price and caused Aetna to make an inflated loan and take an inflated mortgage on the ranch. Thus, Shepherds' second mortgage was rendered valueless. Shepherds based their defense on the contention that Western Farm was an agent of Aetna and its fraud should be imputed to Aetna.

On September 20, 1983, the South Dakota district court issued a memorandum decision finding that there was no merit to Shepherds' allegations of fraud. The court held that: (1) Ranch Mart acted at all relevant times as the exclusive agent of Shepherds; (2) Shepherds, through their agent Ranch Mart, had actual knowledge of Aetna's loan commitment to Shepherds prior to accepting the second mortgage from McElvains on June 29, 1979; (3) Shepherds had constructive knowledge of the amount of Aetna's mortgage as of August 2, 1979, when it was recorded, and prior to Shepherds' recordation of their second mortgage; and (4) Shepherds' second mortgage states the priority of Aetna's first mortgage, which precludes Shepherds from denying the

7

existence and priority of the first mortgage as a matter of law. The South Dakota court issued its findings of fact and conclusions of law on December 5, 1983, repeating the above findings. The court granted summary judgment to Aetna on December 5, 1983. The South Dakota Supreme Court affirmed this decision in February 1985 stating that:

> We conclude that Shepherds had both actual and constructive notice of the amount of the loan and the extent of the mortgage, thus precluding any reliance on fraud or misrepresentations. Therefore, the trial court did not err in its grant of summary judgment.

Aetna Life Ins. Co. v. McElvain (S.D. 1985), 363 N.W.2d 186, 190.

Aetna's foreclosure action on the Montana portion of Box Elder Ranch went to trial December 7, 1983. As a defense to the action, Shepherds again raised the issue of fraud. Shepherds alleged that Aetna, through its agents, knew of the fraud practiced upon Shepherds; the fraud being the representations made to Shepherds that Aetna's loan to McElvains would not exceed $1,100,000.

At trial on December 7, 1983, Aetna introduced into evidence the South Dakota judgment from December 5, 1983, and the other South Dakota court documents. Aetna argued that the South Dakota judgment was res judicata as to Shepherds' defense of fraud.

The Montana District Court, in its judgment of October 29, 1984, conceded that Shepherds pleaded affirmative defenses in the foreign court foreclosure actions which were "essentially the same as the affirmative defenses they have pleaded in this action." (Emphasis added.) The Montana court acknowledged that the South Dakota court entered

8

judgment on the merits. The Montana court apparently rejected the res judicata effect of the foreign judgment because the judgment was on appeal.

The Montana trial court ruled that: (1) Shepherds were defrauded by R.J. McElvain, Jr., and other employees of Western Farm in that Shepherds' second mortgage was rendered valueless; (2) McElvain and Western Farm were the agents of Aetna; (3) therefore, Aetna defrauded Shepherds; (4) Ranch Mart, Shepherds' agent, did not have notice of the size of the Aetna loan before the closing of the ranch sale; (5) even if Ranch Mart had notice, that notice would not be imputed to Shepherds under these circumstances because Aetna did not exercise good faith; and (6) Shepherds' constructive notice of Aetna's prior recorded mortgage could not relieve Aetna of responsibility for its fraudulent acts. The court ruled that Aetna was entitled to foreclose its mortgage but imposed a lien in Shepherds' favor, superior to Aetna's, on the ranch. The amount of the lien was the unpaid balance McElvains owed to Shepherds on the sale of the ranch, with interest, plus $40,000 as attorney's fees. This appeal followed.

The first issue is whether the trial court erred in failing to give collateral estoppel effect to the South Dakota judgment. Aetna asserts that the South Dakota decision, holding that Aetna did not defraud Shepherds, is entitled to full faith and credit in Montana and conclusively defeats the fraud allegations. This issue raises only questions of law and, therefore, the standard of review is clear. This Court is not bound by the determinations of the trial court on questions of law and we are free to draw our

9

own conclusions from the evidence presented. Sharp v. Hoerner Waldorf Corporation (1978), 178 Mont. 419, 584 P.2d 1298.

The United States Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U. S. Const., art. IV, § 1. The federal statutory codification of this constitutional guarantee, 28 U.S.C. § 1738, requires that,

> . . . Acts, records and judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken.

Finally, Montana law provides:

> The effect of a judicial record of a sister state is the same in this state as in the state where it was made, except that it can only be enforced here by an action or special proceeding . . .

Section 26-3-203, MCA.

The Fallon County District Court apparently declined full faith and credit to the South Dakota judgment because that decision, at the time of the Montana trial, was on appeal to the South Dakota Supreme Court. That approach ignores the fact that, in South Dakota, a judgment on appeal can have collateral estoppel or res judicata effect. See, e.g., Black Hills Jewelry Mfg. v. Felco Jewel Ind. (S.D. 1983), 336 N.W.2d 153, 157 ("The doctrine of res judicata serves as <u>claim</u> preclusion to prevent relitigation of an <u>issue actually litigated or which could have been properly</u> <u>raised and determined</u> in a prior action . . . Of course, the earlier court must have had jurisdiction and its decision

must must be final and unreversed." (citations omitted));
Arcon Const. v. South Dakota Dept. of Transp. (S.D. 1985),
365 N.W.2d 866, 868 ("There must, however, be a
final unreversed judgment or decree of a court of competent
jurisdiction before the doctrines of res judicata, collateral
estoppel, or issue preclusion apply" (citations omitted;
emphasis added)). The rule consistently declared by the
United States Supreme Court is that, "'the judgment of a
state court should have the same credit, validity, and
effect, in every other court of the United States, which it
had in the state where it was pronounced.'" (Citations
omitted.) Underwriters Assur. Co. v. N.C. Guaranty Assn.
(1982), 455 U.S. 691, 704, 102 S.Ct. 1357, 1365, 71 L.Ed.2d
558, 570. Given that the South Dakota judgment, although on
appeal, would be entitled to collateral estoppel effect in
South Dakota, that judgment is entitled to the same effect in
Montana if the other requirements for collateral estoppel are
met.

In Montana, the test to determine the applicability of
collateral estoppel is a three part inquiry:

> "(1) Was the issue decided in the prior
> adjudication identical with the one
> presented in the action in
> question? (2) Was there a final
> judgment on the merits? (3) Was the
> party against whom the plea is asserted a
> party or in privity with a party to the
> prior adjudication?"

In Re Marriage of Stout (Mont. 1985), 701 P.2d 729, 733-734,
42 St.Rep. 856, 861, quoting Aetna Life and Casualty
Insurance Company v. Johnson (Mont. 1984), 673 P.2d 1277,
1279, 41 St.Rep. 40, 42. At the trial court level, Aetna
introduced into evidence the South Dakota district court

judgment, findings of fact and conclusions of law, memorandum decision, and pleadings. These documents show that the second and third requirements of the collateral estoppel test are undoubtedly met. In the prior South Dakota adjudication, there was a final judgment on the merits of the fraud issue and the party in this action is identical to the party there. The only real question then is whether the remaining requirement of the test is met; i.e. whether the issue decided in the South Dakota action is identical to the issue here.

After evaluating and comparing the pleadings, evidence and circumstances of the South Dakota action and the case at bar, we make the following observations. Both cases arise from the sale of one ranch, which sale, although requiring the use of three mortgages and three notes, was conducted as one transaction. The misrepresentations which Shepherds complained of in South Dakota are exactly those misrepresentations which they complain of in the instant case. In this regard, we note that Shepherds' answer (in which they raised the fraud defense) to the South Dakota complaint is an identical, word for word copy of their amended answer in the Montana action. We also note that the Montana trial court agreed that Shepherds raised essentially the same defenses in Montana as they had raised in South Dakota. The South Dakota judgment and Supreme Court decision rely on much of the same, crucial evidence that was admitted in the Montana action. The foreign court looked at the exact same evidence as the Montana court in determining whether Shepherds had actual or constructive notice of the fraudulent scheme. We conclude that the issue resolved in South Dakota,

12

whether Shepherds' actual and constructive notice of the fraudulent scheme defeated their fraud defense, is identical to the issue presented in the instant case. Therefore, we hold that the South Dakota judgment is entitled to full faith and credit in Montana and that judgment collaterally estops Shepherds from successfully raising their fraud defense.

Shepherds argue that giving the South Dakota judgment full faith and credit in Montana impermissibly invests the foreign court with in rem jurisdiction over Montana real property. This argument is without merit. Given in personam jurisdiction, a court may adjudicate the <u>rights and equities</u> of parties in reference to real property in a foreign jurisdiction. That is not an impermissible exercise of in rem jurisdiction. A court may <u>not</u> act directly upon the <u>title</u> to real property in a foreign jurisdiction. In Gammon v. Gammon (Mont. 1984), 684 P.2d 1081, 41 St.Rep. 1161, Mr. Justice Weber made that distinction abundantly clear. In <u>Gammon</u>, this Court refused to enforce that part of an Oregon divorce decree which purported to directly transfer Montana property. The Court <u>did</u> enforce the Oregon decree insofar as it determined the equities of the parties in the Montana land. Here, conceding full faith and credit to the South Dakota judgment would honor the foreign court's determination of the rights and equities between the parties but would not impermissibly allow the foreign court to act directly upon the title to Montana real property.

An alternative ground for our holding in this case arises from our resolution of the second issue addressed here. This issue requires a two part inquiry: (1) Did Shepherds have imputed notice of the fraudulent scheme? and

13

(2) If so, does such notice defeat their claim of fraud? The lower court answered both of these questions in the negative, ruling that Shepherds did not have notice imputed to them through Ranch Mart, and even if Shepherds had such notice, that would not "serve as a shield for unfair dealing by" Aetna.

This Court will not disturb findings of fact and conclusions of law that are based on substantial, credible evidence.

> [We] will view the evidence in the light most favorable to the prevailing party and will not overturn the findings and conclusions based on such evidence unless there is a clear preponderance of evidence against them.

Napier v. Adkison (Mont. 1984), 678 P.2d 1143, 1144, 41 St.Rep. 619A, citing Cameron v. Cameron (1978), 179 Mont. 219, 228, 587 P.2d 939, 945.

Ranch Mart, the realty agency, was indisputably the agent of Shepherds. The evidence introduced at trial showed that Ranch Mart had notice, before the consummation of the sale, of the size of the Aetna loan and resulting first mortgage. Wallace Mading, the owner of Ranch Mart, testified by deposition. Mading produced a letter received by Ranch Mart which stated that the Aetna loan had been approved for $1,550,000. The letter was dated June 7, 1979, and Mading agreed that Ranch Mart had received the letter before the closing of the ranch sale on July 6, 1979. Although Mading denied that he knew the contents of the letter prior to the closing, he testified that:

> I am sure that I was aware that Aetna Life Insurance Company was going to be in a million and a half dollar mortgage position, but I did not know what all on

14

. . . I knew that this property was certainly a part of it.

Q. You did know then that they were going to have a mortgage in excess of a million and a half dollars, and that their mortgage would be superior to the second mortgage of the Shepherds?

A. Yes, I am sure that I would have, I would have been aware of it just the way you said it.

Thus, Ranch Mart had notice of the size of the Aetna loan and resulting first mortgage. This notice is imputed to Shepherds under § 28-10-604, MCA, which provides:

As against a principal, both principal and agent are deemed to have notice of whatever either has notice of and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other.

Mading, knowing that Aetna's first mortgage on the land should have been $1,100,000, should have communicated to Shepherds the actual amount ($1,555,000) of Aetna's first mortgage. Therefore, we hold that Shepherds had imputed notice of the actual amount of the first mortgage prior to their closing the sale.

Contrary to the lower court's ruling, the imputed knowledge of Shepherds defeats their claim of fraud. The rule in Montana is that,

When it appears that a party, who claims to have been deceived to his prejudice, has investigated for himself or that the means were at hand to ascertain the truth . . . of any representations made to him, his reliance upon such representations made to him, however false they may have been, affords no ground of complaint. (Citations omitted.) (Emphasis in original.)

Turley v. Turley (Mont. 1982), 649 P.2d 434, 439, 39 St.Rep. 1336, 1343; citing, among others, Van Ettinger v. Pappin

15

(1978), 180 Mont. 1, 588 P.2d 988, 994. The means were at hand for Shepherds to ascertain the truth of the false representations and they cannot, as a matter of law, rely on those representations in claiming fraud. Shepherds' fraud defense is therefore defeated, as the hearer's reliance on the representation and the hearer's right to rely on the representation are critical elements of a prima facie showing of fraud. Turley, 649 P.2d at 438.

We hold that the lower court erred in ruling that Aetna defrauded Shepherds. We do not consider the issues of whether Western Farm, the loan broker, was the agent of Aetna or whether the fraudulent acts of Western Farm are imputable to Aetna. We reverse the District Court and remand this cause for the entry of an unqualified judgment in Aetna's favor.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

16

Mr. Justice John C. Sheehy, dissenting:

I dissent.

The majority opinion proceeds on two premises: that the Shepherds' fraud claim against Aetna is precluded by collateral estoppel by reason of the South Dakota decision; and alternatively, that Shepherds' agent had actual notice of the fraudulent scheme and therefore Shepherds had imputed notice of the scheme.

We should not extend full faith and credit to the South Dakota decision in this case for two reasons: 1) South Dakota's opinion as to the operation of a release is against the public policy of this state; and 2) it is not clear from the South Dakota decision that the precise issue of fraud raised by the Shepherds was considered by the South Dakota court.

South Dakota denied the Shepherds' claim of fraud against Aetna on two grounds, that their agent had notice of the fraudulent act, and that the release given by the Shepherds to McElvains operated to relieve Aetna of any fraudulent claim from the Shepherds. As to the second ground, at least equal weight was given by South Dakota to its determination that the release and satisfaction by the Shepherds operated to merge Shepherds' mortgage lien in the title and thereby precluded any claim of the Shepherds against Aetna on the grounds of fraud.

However, the release given by the Shepherds to the McElvains in return for a quitclaim deed on the South Dakota land expressly released only the McElvains and expressly provided that "[n]o other persons, firms, or entities other

than those expressly mentioned above are in any way released by this document."

It has been the law in this state since Black v. Martin (1930), 88 Mont. 256, 292 P. 577, that a plaintiff may release a joint tortfeasor and still preserve a cause of action against another joint tortfeasor if there is language to that effect in the written release. See also McCloskey v. Porter (1973), 161 Mont. 307, 506 P.2d 845.

When the law enunciated by a court of a sister state is against the public policy of the forum state, the decision of the court of the sister state is not entitled to full faith and credit. In In Re Anderson's Estate (1948), 121 Mont. 515, 524, 194 P.2d 621, 626, we stated:

> Unless the public policy of the state would prevent the recognition of the decree or such recognition would be injurious to the best interests of the state we must recognize the force and effect of the decrees of our sister states . . . (Emphasis added.)

Further, contrary to what is said in the majority opinion, it cannot be determined from the South Dakota opinion what was Shepherds' precise claim of fraud against Aetna. There is no mention in the South Dakota opinion that Aetna's agent, McElvain, forged a buy-sell agreement to show a sales price of $2,185,000 instead of the true agreement of $1,385,000. Knowledge of the true nature of McElvain's fraud is necessary to determine whether the knowledge acquired by Ranch Mart and imputed to the Shepherds by both the South Dakota Court and this Court constitutes notice that fraud was afoot. Both South Dakota and this Court decide that point against the Shepherds by a selective reading of the testimony of Mading, the Ranch Mart agent. The full pertinent testimony of Mading follows:

A.   I wasn't that aware of the amounts, Mr. Huntley.   If McElvain was borrowing a million five hundred thousand dollars, it wasn't readily obvious to me as to what he was going to do with it.   He was in the process of improving the land, and also had properties of his own, and I did not know how that tied in with a million five hundred thousand dollars.

Q.   I am sure that is the case, but is it your testimony that you did not know that Aetna Life Insurance Company was going to be in a first mortgage position on this property with a mortgage in excess of a million and a half dollars?   A. State your question one more time.

Q.   Okay.   Maybe it would be just as handy if I read it back.   I think . . .   (Last question repeated by reporter.)   A.   That is not my testimony.   I am sure that I was aware that Aetna Life Insurance Company was going to be in a million and a half dollar mortgage position, but I did not know what all on [sic] is what I am telling you.

Q.   Okay.   A.   (Continuing.)   I knew that this property was certainly a part of it.

Q.   You did know then that they were going to have a mortgage in excess of a million and a half dollars, and that their mortgage would be superior to the second mortgage of the Shepherds?   A.   Yes, I am sure that I would have, I would have been aware of it just the way you said it.

Q.   And when were you aware of that?   A.   I don't know that I was blatantly aware of it at any time, Mr. Huntley.   It wasn't a glaring thing in that the McElvains, we knew were in a position of improving the property, and, you know, we did not know even to what extent they had improved it by the time that we closed the agreement.   We also knew that the money to be advanced on it was evidently being advanced in different stages, or at least we had been told that.

Q.   Well, did you ever tell the Shepherds, or either one of them, that the Aetna position was going to be first mortgage of in excess of a million and a half dollars?   A.   No, sir.

Q.   Would you explain why you did not tell them that?   A.   It was not our business to tell them that, in that we did not know what all the funds were being used for.   (Emphasis added.)

The full testimony of Mading puts a quite different light on his knowledge of the amount of the mortgage, and the

reasons why he did not convey the information to the Shepherds.

While I accede that the recorded documents constituted constructive notice to the Shepherds of the contents of the mortgages, yet the circumstances of the recording in this case led to the ability of McElvain to deceive the Shepherds. The mortgages were recorded in three different states, in three different amounts in such manner that if the Shepherds went to the three different courthouses, they could determine the total amount but not otherwise. The Fallon County mortgage was for $664,000; the Harding County, South Dakota mortgage was for $751,000 and the Bowman County, North Dakota mortgage was for $140,000. This circumstance of separate recording of the instruments has made it possible for Aetna's agent, McElvain, to hide the true total amount of the mortgages against the Shepherds' property.

Under these circumstances, I would agree with the District Court and hold that the Shepherds lien was entitled to preference ahead of Aetna on the Montana property and affirm the District Court.

_____
Justice

I join in the dissent of Mr. Justice John C. Sheeny.

_____
Justice

I join in the dissent of Mr. Justice John C. Sheehy.

_____
Justice

- 20 -