FILED

04/08/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0261

DA 24-0261

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 71

CHRISTOPHER SHELTON, VICKY COSTA,
and TODD COSTA,

Plaintiffs and Appellants,

v.

STATE OF MONTANA, DEPARTMENT OF
PUBLIC HEALTH AND HUMAN SERVICES,
an agency of the State of Montana, SUSAN
RIDGEWAY, AXILON LAW GROUP, PLLC,
PAUL S. HENNING, AARON J. DAVIES
and DOES 1-20,

Defendants and Appellees.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADV-2018-830
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Tara A. Harris, Melissa Broch, Harris Law Office, PLLC, Helena,
Montana

For Appellee State of Montana:

Patricia Klanke, Drake Law Firm, P.C., Helena, Montana

For Appellees Susan Ridgeway and Axilon Law Group, PLLC:

David Dalthorp, Jackson, Murdo & Grant, P.C., Helena, Montana

For Appellees Paul S. Henning and Aaron J. Davies:

Logan Nutzman, Don C. St. Peter, St. Peter O'Brien Law Offices, P.C.,
Missoula, Montana

Submitted on Briefs: January 23, 2025

Decided: April 8, 2025

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Christopher Shelton, Vicky Costa, and Todd Costa appeal two First Judicial District Court orders dismissing their claims against the State, Susan Ridgeway, and Axilon Law Group stemming from a Utah couple's adoption of L.S., Shelton's biological child. We consider the following restated issues:

> *1. Was the District Court correct that Ridgeway and Axilon owed no duty to Plaintiff when they represented the child's biological mother in the adoption process?*
>
> *2. Does the doctrine of collateral estoppel apply to bar the Plaintiffs' claims against the State when Utah courts approved the adoption?*
>
> *3. Did the District Court err in dismissing Plaintiffs' negligent misrepresentation claim based on statements made by a Department of Public Health and Human Services attorney?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 When Melissa Surbrugg learned she was pregnant in 2015, she arranged for Paul Henning and Aaron Davies of Utah to adopt her child. Henning and Davies (Adoptive Parents) filed a petition for adoption in Utah district court before Surbrugg gave birth. In January 2016, Surbrugg gave birth to L.S. in Helena; Adoptive Parents arrived in Helena shortly thereafter. Surbrugg and L.S. tested positive for amphetamines, methamphetamine, and Suboxone, leading hospital staff to report the incident to the Department of Public Health and Human Services (DPHHS). The hospital discharged Surbrugg before a child protection specialist began investigating. Adoptive Parents took temporary custody of L.S. after Surbrugg appointed them temporary guardians.

3

¶3    With the help of her attorney, Susan Ridgeway with Axilon Law Group, Surbrugg executed an affidavit relinquishing her parental rights to L.S. Ridgeway also helped Surbrugg sign an Interstate Compact on the Placement of Children (ICPC) Request Form 100A because L.S.'s adoption involved placement across state lines. At the time, Surbrugg was married to Christopher Shelton but believed Donald Gleed to be L.S.'s father. Surbrugg therefore listed Gleed as the father on the ICPC request form. Surbrugg's ICPC submission included an affidavit from Gleed relinquishing his parental rights. Ridgeway also included a cover letter noting that, though legally married to Shelton, Surbrugg did not believe him to be L.S.'s father.

¶4    Once Utah approved the ICPC request, Adoptive Parents returned to Utah with L.S. There, they moved for temporary custody in the Utah adoption proceedings. The Utah district court granted the temporary custody motion. Learning that Surbrugg might still be married, Adoptive Parents sent notice of the adoption proceedings to Shelton, who successfully moved to intervene in the case.

¶5    While the Utah adoption proceeding was pending, Shelton filed for dissolution from Surbrugg in Montana. Shelton filed a motion in the Montana proceeding seeking to determine paternity of L.S, which the court granted. Genetic testing showed that Shelton was L.S.'s biological father.

¶6    Adoptive Parents filed a petition with the Utah court to terminate Shelton's parental rights. In relevant part, Shelton responded that because his name was not on the request form, the placement did not comply with the ICPC. The Utah court held a hearing at which

Vicky Costa, Shelton's mother, testified. Vicky testified that she and her husband Todd Costa had filed a petition to adopt L.S. in Montana and that Shelton would consent to their adoption of L.S. Following the hearing, the Utah court terminated Shelton's parental rights, concluding that his criminal history as well as his drug and alcohol addiction prevented him from being a fit parent. The court then finalized the adoption.

¶7     Shelton appealed to the Utah Court of Appeals, arguing that the Utah district court lacked jurisdiction and that Surbrugg's failure to list him as the father on the request form materially violated the ICPC. *Matter of Adoption of B.H.*, 2019 UT App 103, ¶ 1, 447 P.3d 110, *aff'd*, *Matter of Adoption of B.H.*, 2020 UT 64, 474 P.3d 981. The Court of Appeals held that the district court had jurisdiction to terminate Shelton's parental rights and to finalize the adoption. *Adoption of B.H.*, 2019 UT App 103, ¶ 24. Noting that the district court did not state whether L.S.'s placement had complied with the ICPC, the Court of Appeals "set aside the adoption decree and remand[ed] for additional findings and conclusions" to determine whether the placement complied with the ICPC. *Adoption of B.H.*, 2019 UT App 103, ¶ 30.

¶8     Shelton successfully petitioned for review by the Utah Supreme Court. *Adoption of B.H.*, 2020 UT 64, ¶ 6. The Utah Supreme Court affirmed, holding that Utah had jurisdiction over the termination and adoption proceedings. *Adoption of B.H.*, 2020 UT 64, ¶ 65. Due to the deficiency on the ICPC form and the inadequacy of the district court's conclusions of law, the Court "agree[d] with the court of appeals that it [was] necessary to set aside the adoption decree in its current form and remand to the district court for further

5

proceedings." *Adoption of B.H.*, 2020 UT 64, ¶¶ 62-63. On remand, the Utah district court held an evidentiary hearing. The court followed with a written order, concluding that "[a]ll terms and conditions of the [ICPC] from the state of Montana were complied with prior to the commencement of this case." Shelton did not appeal this decision.

¶9 In 2018, as the Utah courts considered the adoption, Plaintiffs filed the complaint at issue here. Plaintiffs brought seven counts against the State, Ridgeway, Axilon Law Group, and Adoptive Parents. In Count I, Plaintiffs sought a declaration that the State violated the ICPC. Count II alleged that the State violated Plaintiffs' state constitutional substantive due process rights. Count III alleged negligence against the State. Counts IV and V alleged negligence and gross negligence against all Defendants. Counts VI and VII alleged negligent infliction of emotional distress against all Defendants and negligent misrepresentation against the State.

¶10 Ridgeway and Axilon (collectively, Ridgeway) moved to dismiss, arguing that they owed no duty to Plaintiffs. The District Court granted Ridgeway's motion, ruling that she did not owe a duty to third parties in an adoption. Adoptive Parents also moved to dismiss. After Plaintiffs did not respond to Adoptive Parents' motion, the District Court dismissed them with prejudice. The State moved for summary judgment, arguing primarily that the Utah district court already decided Montana complied with the ICPC, that the decision was entitled to full faith and credit, and that the ruling precluded Plaintiffs' claims. The District Court granted the State's motion. Plaintiffs appeal the District Court's rulings on the

6

State's motion for summary judgment and on Ridgeway's motion to dismiss. They do not appeal its dismissal of Count III (alleging negligence against the State).[1]

## STANDARDS OF REVIEW

¶11     Construing the factual allegations of a complaint in the light most favorable to the plaintiff, we review de novo a district court's ruling on a M. R. Civ. P. 12(b)(6) motion to dismiss. *Plouffe v. State*, 2003 MT 62, ¶ 8, 314 Mont. 413, 66 P.3d 316 (citations omitted). "We will affirm the District Court's dismissal when we conclude that the plaintiff would not be entitled to relief based on any set of facts that could be proven to support the claim." *Plouffe*, ¶ 8 (citation omitted).

¶12     We review de novo a district court's ruling on summary judgment, applying the standards of M. R. Civ. P. 56. *Martin v. SAIF Corp.*, 2007 MT 234, ¶ 9, 339 Mont. 167, 167 P.3d 916. "The moving party must establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Martin*, ¶ 9 (citation omitted).

¶13     Whether the judgment of another state court is entitled to full faith and credit raises a question of law that we review for correctness. *Aetna Life Ins. Co. v. McElvain*, 221 Mont. 138, 144-45, 717 P.2d 1081, 1085 (1986) (citation omitted). Likewise, "a district court's application of claim preclusion or issue preclusion . . . is an issue of law that we review for correctness." *Brilz v. Metro. Gen. Ins. Co.*, 2012 MT 184, ¶ 13, 366 Mont. 78, 285 P.3d 494 (citations omitted). "A district court's underlying factual determinations, however, are reviewed for clear error." *Brilz*, ¶ 13 (citation omitted).

---

[1] Plaintiffs also do not appeal the dismissal of Adoptive Parents, who have appeared on appeal in support of the District Court's summary judgment order.

DISCUSSION

¶14    *1.  Was the District Court correct that Ridgeway and Axilon owed no duty to Plaintiff when they represented the child's biological mother in the adoption process?*

¶15    "[T]he essential elements of a negligence claim are the existence of a legal duty of care owed by the tortfeasor to the claimant, breach of that duty, causation of harm, and resulting damages." *Anderson v. ReconTrust Co., N.A.*, 2017 MT 313, ¶ 17, 390 Mont. 12, 407 P.3d 692 (citation omitted).  "[A]n attorney has a legal duty of undivided loyalty to a client, a duty which we have held to be inviolate and fundamental to the attorney-client relationship and the proper functioning of our adversarial system of justice." *Sweeney v. Dayton*, 2018 MT 95, ¶ 14, 391 Mont. 224, 416 P.3d 187 (citation omitted).  This duty generally does not extend "to third parties with whom [the attorney] has no agency relationship." *Crane Creek Ranch, Inc. v. Cresap*, 2004 MT 351, ¶ 11, 324 Mont. 366, 103 P.3d 535 (citation omitted).

¶16    In its order on Ridgeway's motion to dismiss, the District Court first noted that the parties agreed Ridgeway had never represented Plaintiffs.  The court cited *Watkins Trust v. Lacosta*, concluding it established a limited exception to the general rule that an attorney owes no duty to third parties with whom she has no attorney-client relationship.  *Watkins Trust v. Lacosta*, 2004 MT 144, ¶¶ 22-23, 321 Mont. 432, 92 P.3d 620.  This exception, the District Court wrote, "applies in only limited circumstances," like the establishment of a trust, "in which a client asks an attorney to perform a task with the express intention of benefitting a third party."  The District Court found *Watkins Trust* inapposite because

Surbrugg did not retain Ridgeway with the intent to benefit Plaintiffs. On this basis, the District Court dismissed Plaintiffs' claims against Ridgeway, ruling that she did not owe them a duty of care.

¶17 Plaintiffs argue that Ridgeway owed them a duty because L.S.'s adoption was not adversarial. Citing *Watkins Trust*, Plaintiffs assert that the mutual intent of Ridgeway and Surbrugg was to secure the adoption of L.S. Relying on *Rhode v. Adams*, Plaintiffs note that attorneys do not owe third party nonclients a duty in adversarial proceedings. *See Rhode v. Adams*, 1998 MT 73, ¶ 22, 288 Mont. 278, 957 P.2d 1124 (citation omitted) ("[W]hen the professional relationship between an attorney and a client is placed within an adversarial context in which the attorney functions as the advocate for the client, the attorney has a different relationship to non-clients than do members of other professions."). Because of the mutual nonadversarial intent of the adoption proceeding, Plaintiffs maintain, Ridgeway owed them a duty of care. Plaintiffs also cite Montana adoption statutes, arguing that Shelton's consent was required for L.S.'s adoption. Last, Plaintiffs ask the Court to "extend a duty to non-client third parties in direct-parental placement adoptions."

¶18 Ridgeway responds that the proceedings were adversarial and created a conflict because she could not "serve the interests of [her] client [Surbugg] in assisting with the adoption, while concurrently serving the interests of [Shelton,] who opposed the adoption." Simultaneously fulfilling a duty to Shelton, Ridgeway argues, would create a conflict of interest and violate her professional obligations under M. R. Pro. Cond. 1.7, which provides

9

that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." "A concurrent conflict of interest exists if . . . the representation of one client will be directly adverse to another client." M. R. Pro. Cond. 1.7(a). Plaintiffs' cases, Ridgeway asserts, support the proposition that an attorney owes a duty to a third party only when the attorney and client mutually intend to directly benefit the third party. Ridgeway argues that she did not owe a duty to Plaintiffs because they were not intended beneficiaries of the adoption.

¶19 We have recognized that "an attorney *may* owe a duty to nonclients in some nonadversarial contexts." *Redies v. Att'ys Liab. Prot. Soc.*, 2007 MT 9, ¶ 44, 335 Mont. 233, 150 P.3d 930. In *Watkins Trust*, Stanley and Carolyn Watkins hired an attorney to draft their wills and a trust agreement related to their trucking operation. *Watkins Trust*, ¶ 6. The attorney did not ensure that the couple's wills were properly executed, nor did she inform Carolyn that when Stanley died, the trust became irrevocable. *Watkins Trust*, ¶¶ 7-8. After the Watkinses died, the trust beneficiary and Carolyn's estate sued the attorney, alleging that she committed legal malpractice in drafting their estate plan. *Watkins Trust*, ¶ 14. On appeal, we considered as a matter of first impression the duty an attorney owes to a nonclient beneficiary. *Watkins Trust*, ¶ 21 (citation omitted). We held that Carolyn's estate had standing to sue the attorney because, at least in the context of a suit brought by the nonclient beneficiary of an estate plan, the "duty to a third party is implied because that is the mutual intent of the attorney and client." *Watkins Trust*,

10

¶¶ 21-23 (quoting Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice*, Vol. 4, § 32.4 (5th ed. 2000)).

¶20    We distinguished *Watkins Trust* in *Harrison v. Lovas*, where George and Helen Harrison retained Lovas, an attorney, to establish a trust for the benefit of their children. *Harrison v. Lovas*, 2010 MT 128, ¶¶ 6, 17, 356 Mont. 380, 234 P.3d 76.   After Lovas assisted the Harrisons in establishing the trust, they approached Lovas to change the distribution of assets through amendment.  *Harrison*, ¶ 7.  The proposed amendment would have benefitted three of the Harrisons' children at the expense of the others.  *Harrison*, ¶ 7. Lovas informed the Harrisons that she needed legal descriptions of the real property to be redistributed through the amendment, but the Harrisons never responded before both died. *Harrison*, ¶¶ 7-8.   Their three children who would have benefitted from the amendment sued Lovas, alleging that she had committed legal malpractice when she failed to complete the amendment before their parents died.  *Harrison*, ¶¶ 8-9.  We found the facts "markedly different" from *Watkins Trust* because the *Harrison* complaint was "premised entirely upon a potential, unexecuted amendment to [the] existing [t]rust." *Harrison*, ¶ 17.  We held that plaintiffs could not sustain their legal malpractice claim against Lovas because Lovas had no attorney-client relationship with them; Lovas's duty ran to plaintiffs' parents because they were her clients.  *Harrison*, ¶ 18.

¶21    We held in *Rhode* that the attorney for Rhode's ex-wife did not owe their children a duty because the interests of a parent and child may not be identical in a custody case. *Rhode*, ¶¶ 23-24.  Recognizing that a duty to third persons may arise in some contexts,

there is no duty when the attorney is representing the client in adversarial proceedings. *Rhode*, ¶ 17.

¶22 Here, at the time Ridgeway began assisting Surbrugg with the adoption, Shelton was not an intended beneficiary; in fact, Ridgeway understood him not to be the child's father. Unlike the limited exception we enunciated in *Watkins Trust*, Ridgeway and her client did not engage in adoption planning to benefit Shelton or the Costas. *Watkins Trust*, ¶¶ 21-23 (citation omitted). Once identified as the biological father, Shelton vigorously opposed L.S.'s adoption—including litigating before Utah's highest court—demonstrating the adversarial nature of this proceeding. Because this proceeding was adversarial and there was no mutual intent to benefit Plaintiffs, the general rule that an attorney owes no duty to nonclient third parties applies. *Crane Creek Ranch*, ¶ 11 (citation omitted). To impose on Ridgeway a duty of care to Shelton in this context would be inconsistent with her ethical obligation under M. R. Pro. Cond. 1.7 to avoid a conflict of interest with her client Surbrugg.

¶23 With Ridgeway owing no duty to Plaintiffs, they can prove no set of facts that would give rise to their negligence claims against her. *Anderson*, ¶ 17. The District Court therefore did not err in granting Ridgeway's motion to dismiss. *Plouffe*, ¶ 8 (citation omitted).

¶24 *2. Does the doctrine of collateral estoppel apply to bar the Plaintiffs' claims against the State when Utah courts approved the adoption?*

¶25 Article IV, Section 1, of the United States Constitution requires states to "give full faith and credit to judicial proceedings of every other state." *Boudette v. Boudette*,

12

2019 MT 268, ¶ 13, 397 Mont. 519, 453 P.3d 893. "Regarding judgments, . . . the full faith and credit obligation is exacting. A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." *State v. Barrett*, 2015 MT 303, ¶ 11, 381 Mont. 299, 358 P.3d 921 (quoting *Baker v. Gen. Motors*, 522 U.S. 222, 232, 118 S. Ct. 657, 663-64 (1998)). We thus apply the same preclusive effect to the judgment of a sister state court that we would apply to a decision of our own.

¶26     "Collateral estoppel, or issue preclusion, bars the reopening of an issue that has been litigated and determined in a prior suit." *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 15, 331 Mont. 281, 130 P.3d 1267 (citation omitted). Collateral estoppel promotes a definite end to litigation while preventing "parties from incessantly waging piecemeal, collateral attacks against judgments." *Baltrusch*, ¶ 15 (citations omitted). We analyze four factors to determine whether collateral estoppel bars re-litigation of an issue:

1) Was the issue decided in the prior adjudication identical to the issue raised in the action in question?

2) Was there a final judgment on the merits in the prior adjudication?

3) Was the party against whom preclusion is asserted a party or in privity with a party to the prior adjudication?

4) Was the party against whom preclusion is asserted afforded a full and fair opportunity to litigate the issue that may be barred?

*Beck v. Dimar*, 2024 MT 176, ¶ 24, 417 Mont. 444, 554 P.3d 130 (quoting *Stricker v. Blaine Cnty.*, 2023 MT 209, ¶ 20, 414 Mont. 30, 538 P.3d 394). Plaintiffs contest all but the second factor.

**Identity of Issues**

¶27 "The identity of issues is the most important element of issue preclusion." *Stricker*, ¶ 21 (quoting *Planned Parenthood v. State*, 2015 MT 31, ¶ 13, 378 Mont. 151, 342 P.3d 684). "To determine whether the issue decided in the prior adjudication is identical to the issue raised in the present case, we compare the pleadings, evidence, and circumstances surrounding the two actions." *Stricker*, ¶ 22 (quoting *McDaniel v. State*, 2009 MT 159, ¶ 33, 350 Mont. 422, 208 P.3d 817). "A litigant cannot avoid preclusion simply by reframing the same issues or raising novel contentions." *Baltrush*, ¶ 25.

¶28 The District Court concluded that the Utah district court explicitly ruled Montana complied with the ICPC, which is determinative in this case. The court rejected Plaintiffs' argument that the Utah courts' application of Utah law, rather than Montana law, made the issue dissimilar.

¶29 Plaintiffs reassert on appeal that the Utah courts did not decide the same issue because they did not apply Montana law to the question of ICPC compliance. The Utah courts decided whether Utah had jurisdiction over the matter, Plaintiffs insist, but not whether Montana complied with the ICPC. Second, they contend that the Utah trial court on remand did not specifically decide whether the State complied with the ICPC. Instead, they maintain that the Utah trial court's ICPC "findings revolved around [Surbrugg's] actions, [Adoptive Parents'] delivery of the ICPC packet to DPHHS," and Montana and Utah's ICPC Administrators' signatures. Plaintiffs argue that the Utah courts' ICPC analysis was substantively deficient.

14

¶30 The State points to the Utah district court's conclusion that "[a]ll terms and conditions of the [ICPC] from the state of Montana were complied with," arguing that this finding decided the identical issue Plaintiffs attempt to relitigate in Montana. The State contends that, although the appeals focused on whether the alleged ICPC noncompliance deprived Utah of jurisdiction, the Utah district court on remand directly found that Montana complied with the ICPC. Plaintiffs' remaining arguments, the State responds, are "so intertwined" with the ultimate issue of ICPC compliance that to address them the District Court would have to rehear the same issues already decided by the Utah trial court. *Baltrusch*, ¶ 25 (quoting *Martelli v. Anaconda-Deer Lodge Cnty.*, 258 Mont. 166, 169, 852 P.2d 579, 581 (1993)) ("[W]e have justified applying collateral estoppel when the 'issues are so intertwined that to decide the issue before it, the [District] Court would have to rehear the precise issue previously decided . . . .'").

¶31 Plaintiffs largely argue that the Utah district court's analysis was flawed, alleging various ways in which the State failed to comply with the ICPC. "A litigant cannot avoid collateral estoppel simply by reframing the same issues or raising new arguments." *Brishka v. State*, 2021 MT 129, ¶ 21, 404 Mont. 228, 487 P.3d 771 (citation omitted). Plaintiffs' new arguments and reframing of the issues—here, by alleging that the Utah courts failed to apply Montana law—do not prevent application of collateral estoppel to their claims. *Brishka*, ¶ 21. The question before us is not whether the Utah court reached its decision correctly, but whether the Plaintiffs raise the same issue that the Utah trial court previously decided. *See Dimar*, ¶ 24 (citation omitted). We do not consider Plaintiffs'

15

arguments that challenge the correctness of the Utah district court's decision because they are not relevant to determining whether the Utah district court previously decided that Montana complied with the ICPC.

¶32 The Utah Court of Appeals "set aside the adoption decree and remand[ed] for additional findings and conclusions on whether the requirements of the ICPC have been complied with." *Adoption of B.H.*, 2019 UT App 103, ¶ 30. The Utah Supreme Court held that the ICPC deficiency in the case did not deprive Utah of jurisdiction and agreed "to set aside the adoption decree in its current form and remand to the district court for further proceedings." *Adoption of B.H.*, 2020 UT 64, ¶¶ 62-63. Though the Utah appellate opinions addressed Utah's jurisdiction, they returned the case to the state district court expressly to decide whether the process—necessarily involving both states—complied with the ICPC. *See* §§ 41-4-101, -103, MCA. The Utah district court took evidence on the question and broadly ruled that "[a]ll terms and conditions of the [ICPC] from the state of Montana were complied with prior to the commencement of [the adoption]." Shelton did not appeal. The District Court found this conclusion to be a ruling that Montana complied with the ICPC in L.S.'s placement, the precise issue that Plaintiffs attempt to relitigate in Montana. Plaintiffs have not demonstrated error in that determination.

**Privity**

¶33 "The concept of privity in the context of a judgment 'applies to one whose interest has been legally represented at trial.'" *Denturist Ass'n of Mont. v. State*, 2016 MT 119, ¶ 14, 383 Mont. 391, 372 P.3d 466 (quoting *Holtman 4-G's Plumbing & Heating*,

264 Mont. 432, 437, 872 P.2d 318, 321 (1994)). Two parties are in privity where they "are so closely aligned in interest that one is the virtual representative of the other . . . ." *Denturist Ass'n*, ¶ 14 (quoting *Nordhorn v. Ladish Co.*, 9 F.3d 1402, 1405 (9th Cir. 1993)) (citation omitted). Although there is a "deep-rooted historic tradition that everyone should have his own day in court," collateral estoppel may preclude the nonparty in an earlier adjudication from relitigating an issue when its privy represented the same interest in the previous suit. *Denturist Ass'n*, ¶ 14 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892-93, 128 S. Ct. 2161, 2171 (2008)).

¶34 The District Court considered whether the Costas were in privity with Shelton in the Utah proceedings, acknowledging that neither party disputed Shelton was a party in the prior adjudication. Recognizing that the Costas were not parties, the court highlighted Plaintiffs' assertion that the "Costas spent a considerable amount of time and resources contesting . . . [the] adoption proceeding in Utah." Vicky Costa's and Shelton's testimonies in the Utah proceedings, the District Court reasoned, supported the conclusion that the Costas and Shelton were in privity. Shelton testified that he would relinquish his parental rights so that Vicky could adopt L.S., and Vicky testified that she intended to do so. In concluding that the parties were in privity, the District Court also observed that the Costas' legal interest in L.S. would be as grandparents, dependent upon Shelton's legal interest as the parent.

¶35 Plaintiffs maintain that Shelton and the Costas were not in privity during the Utah proceedings. Plaintiffs cite *Parentage of E.A.*, a Kansas case, contending that the Kansas

17

Court of Appeals refused to apply collateral estoppel to a grandfather who asserted an interest in his grandchild's adoption. *Parentage of E.A.*, 62 Kan. App. 2d 507, 518, 518 P.3d 419, 428 (2022), *rev'd on other grounds by Matter of E.A.*, 319 Kan. 748, 560 P.3d 1149 (2024). Plaintiffs argue that, as in that case, we should hold that the Costas were not in privity with Shelton because they were not parties to the Utah adoption.

¶36 The State responds that the Costas and Shelton were in privity because the Costas' interest as grandparents derives entirely from Shelton's rights as L.S.'s biological father. The State cites § 40-9-102, MCA, in support of this proposition, which provides that a district court may grant grandparents reasonable rights to contact unless the child has been adopted by a person other than a stepparent or a grandparent. The State adds that the Utah district court admitted into evidence an agreement appointing Vicky Costa as Shelton's attorney-in-fact. Shelton's attempt to preserve his parental rights so the Costas could adopt L.S., the State insists, also shows that they were in privity. Last, the State distinguishes *Parentage of E.A.*, arguing that, unlike here, the grandfather's parental interest did not derive from the biological father's parental rights.

¶37 First, we agree with the State that *Parentage of E.A.* is not on point. There, the Kansas Court of Appeals held that "[c]ollateral estoppel does not seem to apply" when the grandfather sought a judicial determination of his parentage after, in a separate adoption case, a trial court denied him party in interest status. *Parentage of E.A.*, 62 Kan. App. 2d at 518-19, 518 P.3d at 428. The appeals court's collateral estoppel inquiry was brief and, aside from stating the collateral estoppel elements, did not mention privity. *Parentage of*

*E.A.*, 62 Kan. App. 2d at 518-19, 518 P.3d at 428. Unlike the Costas, the grandfather's interest in *Parentage of E.A.* was independent of the child's parents'—the grandfather claimed that he was the presumed father of E.A. because he openly and notoriously acted as the child's father for years. *Parentage of E.A.*, 62 Kan. App. 2d at 511, 518 P.3d at 423-24. These facts render the case materially distinguishable.

¶38 Taken together, the facts demonstrate that Shelton and the Costas were "so closely aligned in interest" that they were in privity for the Utah adoption proceedings. *Denturist Ass'n*, ¶ 14 (quoting *Nordhorn*, 9 F.3d at 1405). Shelton intended to relinquish his parental rights so the Costas could adopt L.S.; Plaintiffs alleged in their complaint that the Costas spent "considerable . . . time and resources" contesting the adoption; and Vicky Costa acted as Shelton's attorney-in-fact for the adoption. The Costas were not parties to the Utah proceedings but worked closely with Shelton in attempting to defeat the adoption. Shelton acted as their virtual representative because their interest as grandparents was reliant on the preservation of Shelton's parental rights. The District Court therefore correctly determined that Shelton and the Costas were in privity for the Utah adoption.

**Full and Fair Opportunity to Litigate**

¶39 "The burden is on the party attempting to defeat the application of issue preclusion to establish the absence of a full and fair opportunity to litigate." *McDaniel*, ¶ 42 (citation omitted). That the party failed to raise certain defenses in the prior suit "does not necessarily mean that the party has been denied a full and fair opportunity to litigate the issue to be barred." *McDaniel*, ¶ 45 (citation and internal quotation marks omitted).

¶40      The District Court considered the Utah Supreme Court's decision addressing several of Shelton's ICPC compliance arguments and noted that the Utah Supreme Court remanded for the trial court to make further findings. That court held an evidentiary hearing specifically to address the question of ICPC compliance. Concluding that Plaintiffs had a full and fair opportunity to litigate the issue in the Utah courts, the District Court reasoned that, considering the full faith and credit clause, their inability to do so in a Montana court was not determinative of collateral estoppel.

¶41      Plaintiffs insist that they did not receive a full and fair opportunity to litigate whether DPHHS violated the ICPC under Montana law because DPHHS was not a party to the Utah proceedings. Plaintiffs argue that in Utah they litigated "whether Utah had jurisdiction and whether [Shelton's] parental rights should be terminated under Utah law," but not the question of ICPC compliance. Because the ICPC is an interstate compact with uniform provisions, the State responds that it could not have both complied with the ICPC under Utah law yet violated its provisions under Montana law. Section 41-4-101, MCA. The State contends that the Utah district court did specifically address DPHHS's compliance with the ICPC when it wrote:

> Compliance with [the] ICPC is evidenced . . . by the . . . ICPC 100A Form signed by the Sending State (Montana) Compact Administrator on February 8, 2016, and by the Receiving State Compact Administrator on February 9, 2016. The Court notes that ICPC approval was granted by both states' Administrators subsequent to the delivery of the ICPC Form and cover letter identifying both alleged fathers.

¶42      Plaintiffs do not cite legal authority for their argument that DPHHS's non-party status during the Utah proceedings prevented them from having a full and fair opportunity

20

to litigate whether the agency complied with the ICPC. *See Brishka*, ¶¶ 3-8, 16 (plaintiffs' claims against MDT barred by prior litigation even though the agency was not a party because the identical issue—the cause of a breached pond—was previously litigated and decided).

¶43 The record belies Plaintiffs' argument that they did not have a full and fair opportunity to litigate ICPC compliance in the Utah courts. The Utah trial court held an evidentiary hearing with the specific purpose, as it stated, of "receiv[ing] evidence regarding ICPC compliance." Based on the evidence, including the ICPC 100A Form signed by Montana and Utah's compact administrators, the court expressly ruled that Montana complied with the ICPC. The issue was directly before the Utah court, Plaintiffs actively participated in and contested the matter, and the court squarely addressed it. As Plaintiffs received a hearing and final decision from the Utah trial court on ICPC compliance, the Plaintiffs have not established the absence of a full and fair opportunity to litigate this issue. *McDaniel*, ¶ 42 (citation omitted).

¶44 In sum, the District Court correctly ruled that collateral estoppel bars Plaintiffs' claims against all Defendants stemming from the ICPC noncompliance allegations. The District Court did not err in refusing to reexamine the State's compliance with the ICPC in this proceeding.

¶45 *3. Did the District Court err in dismissing Plaintiffs' negligent misrepresentation claim based on statements made by a Department of Public Health and Human Services attorney?*

¶46   Plaintiffs' negligent misrepresentation claim rests on an allegation that DPHHS's chief legal counsel, Frank Clinch, "made representations that he would take action to have L.S. returned to the State . . . following confirmation of [Shelton's] paternity of L.S. through DNA testing."  To prevail on a negligent misrepresentation claim, a plaintiff must prove that

a) the defendant made a representation as to a past or existing material fact;

b) the representation must have been untrue;

c) regardless of its actual belief, the defendant must have made the representations without any reasonable ground for believing it to be true;

d) the representation must have been made with the intent to induce the plaintiff to rely on it;

e) the plaintiff must have been unaware of the falsity of the representation; it must have acted in reliance upon the truth of the representation and it must have been justified in relying upon the representation;

f) the plaintiff, as a result of its reliance, must sustain damage.

*Morrow v. Bank of Am.*, 2014 MT 117, ¶ 45, 375 Mont. 38, 324 P.3d 1167 (emphasis omitted) (quoting *Kitchen Krafters v. Eastside Bank*, 242 Mont. 155, 165, 789 P.2d 567, 573 (1990), *overruled in part by Busta v. Columbus Hosp.*, 276 Mont. 342, 370, 916 P.2d 122, 139 (1996)).  All elements of negligent misrepresentation must be present for the tort to be actionable.  *WLW Realty Partners, LLC v. Cont'l Partners VIII, LLC*, 2015 MT 312, ¶ 29, 381 Mont. 333, 360 P.3d 1112 (citation omitted).

¶47   The District Court reasoned that, under the first element of the claim, the misrepresentation must relate to a past or existing material fact rather than to a future event.

Because Clinch's statement concerned a potential future event, the court ruled that Plaintiffs' negligent misrepresentation claim failed on the first element, disposing of the entire claim. Plaintiffs contend that the case the District Court cited, *WLW Realty Partners*, is distinguishable because the misrepresentation there "was due to a reliance on a third party's action." They also argue that Clinch's representation was factual, not a legal opinion, and therefore they satisfied the first element. The State responds that our negligent misrepresentation cases make no distinction between misrepresentation as to fact and opinion. Instead, the State argues, "[t]he distinction is between . . . a fact that exists and can be objectively demonstrated to be true or false at the time the statement is made; and . . . a fact that does not yet exist and might turn out to be true or false in the future."

¶48 "We have emphasized regarding the first element that 'the false representation must relate to a fact already in existence.'" *WLW Realty*, ¶ 24 (quoting *Kitchen Krafters*, 242 Mont. at 165, 789 P.2d at 573). The State is correct that our negligent misrepresentation case law distinguishes between a past or existing fact and a future fact; if the accuracy of the alleged representation cannot be determined until after it was made, the first factor fails. *WLW Realty*, ¶¶ 24, 27 (citations omitted). *See also Morrow*, ¶ 45 (citation omitted); *Jackson v. Dep't of Family Servs.*, 1998 MT 46, ¶ 36, 287 Mont. 473, 956 P.2d 35 (citation omitted).

¶49 Clinch allegedly told Shelton that, in the future, if Shelton turned out to be the biological father, he "would take action to have L.S. returned to the State." This representation did not relate to a fact already in existence but to potential events that had

not at that time occurred.  *WLW Realty*, ¶ 24.  Consequently, the District Court correctly ruled that Plaintiffs could not establish the first element of negligent misrepresentation. The District Court did not err in dismissing Plaintiffs' negligent misrepresentation claim.

## CONCLUSION

¶50  Ridgeway owed no duty to Plaintiffs as nonclients in an adversarial adoption; the District Court therefore correctly granted Ridgeway's motion to dismiss.  Likewise, the Court did not err in applying the collateral estoppel factors to Plaintiffs' claims regarding ICPC compliance.  The court correctly granted the State's motion for summary judgment. The District Court's judgment is affirmed in its entirety.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M BIDEGARAY
/S/ INGRID GUSTAFSON